BOOTH NEWSPAPERS, INC v UNIVERSITY OF MICHIGAN
BOARD OF REGENTS

Docket Nos. 93246, 93247. Argued April 1, 1993 (Calendar No. 5).
Decided September 28, 1993.

Booth Newspapers, Inc., doing business as the Ann Arbor News,
and the Detroit Free Press, brought an action in the Wash-
tenaw Circuit Court against the University of Michigan Board
of Regents, seeking declaratory and injunctive relief regarding
procedures employed by the board's Presidential Selection Com-
mittee in choosing a new president of the university. The
plaintiffs alleged violation of the Open Meetings Act, MCL
15.261 *et seq.*; MSA 4.1800(11) *et seq.*, and sought to compel the
disclosure of information regarding persons considered as can-
didates for the presidency, discussions of the qualifications of
the candidates, decisions of certain nonquorum committees as
the number of candidates was narrowed, and disclosure under
the Freedom of Information Act, MCL 15.231 *et seq.*; MSA
4.1801(1) *et seq.*, of the travel destinations of certain regents
who conducted candidate interviews. The court, Ross W. Camp-
bell, J., granted summary disposition for the defendant. The
Court of Appeals, HOOD, P.J., and JANSEN, J. (G. S. ALLEN, J.,
concurring), affirmed in part and reversed in part, finding that
the Open Meetings Act, but not the Freedom of Information
Act, had been violated, and enjoined the defendant from fur-
ther use of its presidential selection procedure (Docket Nos.
120478, 120543). The parties appeal.

In an opinion by Justice MALLETT, joined by Chief Justice
CAVANAGH, and Justices LEVIN and BRICKLEY, the Supreme
Court *held:*

Both the Open Meetings Act and the Freedom of Information
Act were violated. All deliberations, decisions, and interviews
regarding presidential searches at public universities must be
conducted openly, consistent with the requirements of the OMA.

REFERENCES
Am Jur 2d, Colleges and Universities § 11.
See ALR Index under Colleges and Universities; Freedom of Infor-
mation Acts.

Travel expense records connected with such searches are not exempt from a request for disclosure under the FOIA.

1. The Open Meetings Act requires a public meeting for all decisions of a public body and all deliberations involving a quorum of its members. A public body includes a committee, subcommittee, authority, or council, that is empowered by the constitution, statutes, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority. The University of Michigan Board of Regents is a public body, as are its subcommittees, including a committee consisting of a single member, that are empowered to exercise its authority. The selection of its president is an exercise of governmental authority, regardless of whether it was made by an individual regent, a nominating committee, the entire board, or a subcommittee.

2. The OMA applies to all decisions by public bodies regardless of whether there is a formal vote. In this case, the board adopted a procedure that violated the OMA because the only part of the decision-making process that occurred in public was the final step—selecting the president from a list of one. The PSC did not make a public decision to appoint the president, it merely announced its decision publicly. In addition, all interviews by a public body for employment in or appointment to a public office must be held in an open meeting. The board, in further violation of the act, went beyond the OMA exception permitting closed sessions to review personal matters contained in a candidate's application in reducing the number of candidates by conducting closed interviews.

3. The board was not justified in failing to disclose the travel expense records of certain regents under § 13(1)(a) of the Freedom of Information Act, which exempts disclosure of information of a personal nature that would constitute a clearly unwarranted invasion of privacy. Travel expense records of a public body do not contain such information.

Affirmed in part, reversed in part, and remanded.

Justice BOYLE, concurring in part and dissenting in part, stated that the Open Meetings Act does not compel information gathered in the initial presidential screening process to be disclosed to the public, nor does it dictate the revelation of a candidate's identity without consent or before the scheduling of a public interview. In addition, the Freedom of Information Act was not violated by redacting the final destinations on the regents' travel expense forms.

Although the President Selection Committee was a public body for purposes of the Open Meetings Act because, in reality, it was the Board of Regents, it was not required under the act

to conduct every aspect regarding the hiring of a president in public view. Initial activities in screening the pool of candidates were ministerial in nature and not public business within the purview of the act. Subsequent closed meetings to review the qualifications of candidates who requested confidentiality were consistent with the act. It was only when the committee conducted private interviews and solicited input from a quorum of the board to narrow the list of candidates that the act was violated.

Because its membership included the entire public body, i.e., the board, the committee was unable to make a genuine advisory recommendation. Under the act, it was required to conduct interviews and make decisions in public. To maintain the confidentiality requested by preliminary candidates and to recommend a pool of finalists for consideration by the full public body, a true advisory committee should have been created.

The Freedom of Information Act does not require blanket application without regard to factual context. The information requested by the plaintiffs regarding travel expense vouchers of all persons involved in interviewing candidates, while ordinarily impersonal, took on an intensely personal character under the circumstances relating to the identities of the candidates as applicants for employment.

Justice LEVIN additionally concurred with Justice BOYLE, except with respect to her discussion of the Freedom of Information Act.

Justice RILEY, joined by Justice GRIFFIN, dissenting, stated that application of the OMA and the FOIA to governing boards of public universities during the selection of university presidents violates the autonomy vested in the boards by Const 1963, art 8, § 5, and warrants review by the Supreme Court.

The constitution confers an independent governmental status on public universities and grants their boards of regents the exclusive power to elect their presidents. The Legislature may not impose conditions upon a board of regents that interfere with the supervision, management, or control of a university or that are related to its finances, property, or educational mission. It may only regulate university-related activities that have bearing on the general welfare and that arise from a constitutionally granted power.

In this case, application of the OMA and the FOIA would control the actions of the board of regents by dramatically altering the method used in the presidential selection process. Such application is beyond the realm of legislative authority.

Moreover, the constitution rejects legislative attempts to open the presidential selection process because it fails to include the informal presidential search process in its mandatory disclosure provisions. Const 1963, art 8, § 4 limits public oversight of universities to formal sessions. The decision whether informal meetings are to be held publicly is vested in the regents. Thus, the presidential selection process need not be disclosed except when conducted in a formal meeting.

192 Mich App 574; 481 NW2d 778 (1992) affirmed in part and reversed in part.

SCHOOLS — PUBLIC UNIVERSITIES — PRESIDENTIAL SEARCHES — OPEN
    MEETINGS ACT — FREEDOM OF INFORMATION ACT.

All deliberations, decisions, and interviews regarding presidential searches at public universities must be conducted openly, consistent with the requirements of the Open Meetings Act; travel expense records connected with such searches are not exempt from a request for disclosure under the Freedom of Information Act (MCL 15.261 *et seq.*; MSA 4.1800[11] *et seq.*, MCL 15.231 *et seq.*; MSA 4.1801[1] *et seq.*).

*Dykema, Gossett* (by *Jonathan D. Rowe* and *Kathleen D. Hunt*) and *Honigman, Miller, Schwartz & Cohn* (by *Herschel P. Fink* and *Michael A. Gruskin*) for the plaintiffs.

*Hooper, Hathaway, Price, Beuche & Wallace* (by *Roderick K. Daane*) for the defendant.

Amici Curiae:

*Mark Brewer* (*Paul Denenfeld,* of counsel), for Common Cause in Michigan and ACLU Fund of Michigan.

*Miller, Canfield, Paddock & Stone* (by *Charles A. Duerr, Jr.,* and *Richard A. Jones*) for the Board of Control of Northern Michigan University, and on behalf of the following attorneys, *Mary Elizabeth Kurz,* for the Board of Trustees of Michigan State University, *Daniel J. Bernard,* for

the Board of Trustees of Wayne State University, *Kenneth A. McKanders,* for the Board of Regents of Eastern Michigan University, and *Currie & Kendall, P.C.* (by *William C. Collins*), for the Board of Control of Saginaw Valley State University.

*Phillips & Russell* (by *Dawn L. Phillips*) for the Michigan Press Association.

*Kasiborski, Ronayne & Flaska* (by *John J. Ronayne, III*) (*Jane E. Kirtley, Rebecca Daugherty,* and *Eric Robinson,* of counsel), for the Reporters Committee for Freedom of the Press, and (*Mark Goodman,* of counsel), for the Student Press Law Center.

MALLETT, J. The dispositive issues in this case are whether the presidential selection procedure adopted by the University of Michigan Board of Regents violated the Open Meetings Act, MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.,* or the Freedom of Information Act, MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.*

We find that defendant violated the OMA and the FOIA. Therefore, we affirm in part and reverse in part the Court of Appeals decision.

I

On April 28, 1987, Harold Shapiro announced his resignation as President of the University of Michigan, effective January 3, 1988. In May of 1987, the Board of Regents, consisting of eight members, appointed itself as the Presidential Selection Committee and began the process of choosing a new university president. The committee appointed Regent Paul W. Brown as chairman and formed three advisory committees to assist it: a

student committee, a faculty committee, and an alumni committee.

By the fall of 1987, the Presidential Selection Committee had compiled an informal list of 250 potential candidates to replace President Shapiro. No formal applications were submitted by the candidates themselves. Rather, most of the candidates were recommended by third parties, who advised the committee of the candidates' qualifications. The committee's administrative secretary compiled a notebook of information relating to each candidate, and the board members reviewed these materials to evaluate the various individuals. To reduce the field of candidates, the committee made a series of "cuts," narrowing the list from 250 to one.

The first cut reduced the number of candidates from 250 to 70. The Presidential Selection Committee entrusted Regent Brown with sole authority to make the first cut, and he did so after numerous telephone calls and meetings with the advisory committees and informal subquorum groups of regents.[1] The acknowledged purpose of the telephone calls and the subquorum meetings was to achieve the same intercommunication that could have been achieved in a full board meeting.[2] During this process, the board avoided quorum meetings because it would have been required to conduct a public meeting under the OMA. In fact, Regent Roach told an Ann Arbor News reporter on November 15, 1987, that if it had not been for the OMA and the desire not to discuss these matters in public,

> we would [have been] able to sit down with all the regents present, discuss the problems and talk

[1] Five regents constituted a quorum of the Board of Regents.

[2] Deposition of Regent Power, pp 52-53.

about all the candidates at a much earlier point.
[Instead], it [took] three or four hours to go around
the horn on the telephones and find out what
everybody is thinking.[3]

After gaining thorough input from all the regents,
Brown's first decision was largely an arithmetic
function rather than a matter of judgment.[4] How-
ever, any regent could review Brown's list of sev-
enty candidates and request the retention of a
particular candidate, despite his decision to elimi-
nate the candidate from consideration.

The second phase of cuts employed essentially
the same procedure as the first. During this phase,
the Presidential Selection Committee narrowed
the candidate list from seventy to thirty. Again,
Regent Brown telephoned individual regents, and
all regents participated in the reduction process.
Subquorum-sized groups of regents met to discuss
the candidates and to reach a consensus regarding
the desired individuals. One regent testified that
candidates were rated, the ratings were tallied and
circulated, and Brown discussed the results pri-
vately with each regent to insure that the list of
thirty would be acceptable to the entire commit-
tee.[5]

The candidates themselves made the third cut.

[3] See Ann Arbor News, November 15, 1987, "Privacy complicates
U-M search" (quoting Regent Roach).

[4] Deposition of Regent Power, p 13.

[5] In testimony regarding this first and second cut, there were
conflicting statements taken from various regents concerning whether
formal "rating sheets" were circulated and used by the Presidential
Selection Committee to vote on a particular candidacy. Regent Roach,
for example, stated that ranking sheets were provided for advisory
committees and that they were given to the committee members for
their review. See deposition of Regent Roach, p 49. Regent Varner
described rating sheets and a complete ranking system. See deposition
of Regent Varner, pp 10-14. Regent Brown, however, denied using
any "tally" or "score" sheets mentioned by other members of the
committee. See affidavit of Regent Paul W. Brown, June 12, 1989.

Brown called the thirty remaining candidates and asked if they would be interested in the position. At this point, more than half the candidates removed themselves from consideration, but twelve candidates expressed their desire to remain on the list.

In March and April of 1988, groups of two, three, or four regents conducted private interviews in the candidates' home cities. Although the Presidential Selection Committee referred to these meetings as "visits," at least one regent conceded that, like any interview, these meetings were to assess and possibly recruit candidates.[6]

Before these interviews, candidates informed the regents that they desired their candidacy to remain confidential by signing a form letter that the board had prepared in advance. Subsequently, the candidates and the groups of visiting regents met to discuss the position and the candidates' interests and qualifications. After these meetings, some regents submitted written reports of their impressions of the candidates to the other regents, while others telephoned Brown with their impressions.

The fourth cut followed a number of closed meetings held by the board to discuss the remaining twelve candidates, those "most seriously considered" by the Presidential Selection Committee.[7] The board believed that it could now justifiably convene in closed sessions because of the candidates' request for confidentiality. Following these closed sessions, Brown reduced the list of candidates from twelve to five. Although the regents contended that no voting occurred at these closed meetings, they agreed that they reached a general consensus and that Brown's list of five candidates

[6] See deposition of Regent Nielsen, pp 31-32.

[7] See affidavit of Regent Paul W. Brown, May 25, 1988.

reflected the views of the entire Presidential Selection Committee.[8]

On May 20, 1988, the board resolved to form a "nominating committee" to decide which candidates would be placed in nomination for action by the board. On May 24, 1988, before the nominating committee met, seven of the regents held a closed meeting to discuss the results of the interviews and to reveal their opinions regarding each of the remaining candidates. The board insisted that no voting took place at this time. It conceded, however, that, on the basis of a consensus, two of the candidates were preferred over the other three.

Immediately following this closed meeting, the nominating committee met, considered the entire candidate list, and decided that only two preferred candidates would remain. This was the fifth cut. After this decision and various informal discussions between committee members and the two remaining candidates, the nominating committee unanimously decided to recommend one candidate, Dr. James Duderstadt, to the board.[9] Dr. Duderstadt was interviewed in an open session by the regents and by selected student, faculty, and alumni representatives. Following this open inter-

[8] See deposition of Regent Nielsen, p 41 ("[t]he regents [made the decision about who the five were]"); deposition of Regent Brown, p 60 ("that was the list that was most acceptable to the regents"); see also deposition of Regent Varner, pp 34-37; deposition of Regent Power, pp 38-39, 42-44; deposition of Regent Roach, pp 26-30; deposition of Regent Baker, pp 39-40 ("a consensus process is what it is all the way through").

[9] The other candidate, widely known to be Dr. Vartan Gregorian, actually withdrew his name from consideration after a telephone call from Regent Baker in which he had expressed reservations about Dr. Gregorian's candidacy. See deposition of Regent Baker, pp 44-46; October 18, 1988 letter from Regent Baker to Ed Petykiewicz, editor of the Ann Arbor News. According to Dr. Gregorian, Regent Baker threatened to "politicize" his candidacy if Dr. Gregorian continued to pursue the presidency. See Ann Arbor News, "Candidate says U-M conducted search in climate of distrust," November 3, 1988.

view, the nominating committee met in a closed session, and recommended the nomination of Dr. Duderstadt. The board subsequently reconvened in a public session and voted to elect Dr. Duderstadt president of the University of Michigan.

Booth Newspapers, Inc., doing business as the Ann Arbor News, and the Detroit Free Press, Inc., brought an action in Washtenaw Circuit Court, alleging that the Board of Regents had violated the Open Meetings Act and the Freedom of Information Act. Plaintiffs sought declaratory and injunctive relief against the procedures employed by the Presidential Selection Committee. Plaintiff sought to have the court compel the board to make available the information regarding persons considered for the presidency, the discussions among the regents of the respective qualifications of each individual, and the decisions of certain nonquorum committees as they narrowed the candidates. It also sought disclosure under the FOIA of the destinations to which individual regents traveled for the purpose of interviewing candidates.

The trial court denied all requested relief and granted defendant summary disposition. The Court of Appeals reversed in part and affirmed in part, finding that defendant had violated the OMA, but not the FOIA. 192 Mich App 574; 481 NW2d 778 (1992). Further, the panel enjoined defendant from further use of the procedure that had been utilized in selecting the university president and awarded plaintiff attorney fees and costs to be determined by the trial court on remand. Defendant filed an application for leave to appeal and plaintiffs filed an application for leave to appeal as cross-appellant. This Court granted both applications. 441 Mich 881 (1992).

II

A. OPEN MEETINGS ACT

1. THE LEGISLATIVE INTENT

Courts are bound to discover and to apply the Legislature's intent, when interpreting statutory mandates. *In re Certified Question,* 433 Mich 710, 722; 449 NW2d 660 (1989). The legislative intent questioned in the instant case concerns the degree of accessibility the Legislature intended to afford the general public in observing the decision-making processes of public bodies.

During the late 1960s, Michigan's Constitution and a patchwork of statutes required account-ability and openness in government.[10] In 1968, the Legislature directly addressed this issue by enact-ing an open meetings statute applicable to most public bodies. 1968 PA 261. The statute required only that public entities conduct final votes on certain subjects at meetings open to the public. Consequently, all other decisions and deliberations by public bodies could lawfully be held in closed sessions. Most importantly, because the 1968 stat-ute failed to impose an enforcement mechanism and penalties to deter noncompliance, nothing prevented the wholesale evasion of the act's provi-sions. See 1970 CL 15.251-15.253. In 1973, the Michigan Senate established the Special Senate Study Committee on Political Ethics to study a variety of topics, including the 1968 statute. See Senate Resolution No. 7, 1973 Journal of the Sen-ate 36-37. The committee concluded that revisions to the open meetings law were necessary. It stated:

[10] See, e.g., *Const 1963,* art 4, § 20 (state legislative "*doors of each house shall be open*"); MCL 117.3(1); MSA 5.2073, MCL 78.23(j); MSA 5.1533(j) (sessions of city legislative and village bodies "shall be available to the public").

"The fact that only the meetings, or parts of meetings, at which votes are actually taken are considered public effectively insulates members of these bodies from public pressure.

"Since final decisions of a public body are the only items that must be made public, nothing in Michigan law prevents members of any public body, even including school boards, from discussing a proposal, adjourning to an executive session where members can agree privately on the action to be taken and then reconvene the 'public' meeting for the one or two minutes required to formally vote on their privately-arranged agreement. Actually, under existing law it is really not necessary for a public body in Michigan to go through even this semblance of openness if it doesn't want to." [Osmon, *Sunshine or shadows: One state's decision,* 1977 Det Col L R 613, 620, n 54, quoting Preliminary Final Report 10-11 (August, 1973).]

To rectify the ineffectiveness of the 1968 statute, legislators introduced bills to comprehensively revise and substantially improve the law. The current Open Meetings Act resulted from these legislative efforts.

2. THE OMA'S PURPOSE

Yet another fundamental rule of statutory construction is to examine a statute's purpose as evidenced by the Legislature. *In re Certified Question, supra* at 722. In the instant case, the OMA's legislative purposes were to remedy the ineffectiveness of the 1968 statute and to promote a new era in governmental accountability. Legislators hailed the act as "a major step forward in opening the political process to public scrutiny." 1976 Journal of the House 2242 (June 24, 1976, remarks of

Representative Wolpe).[11] During this period, law-makers perceived openness in government as a means of promoting responsible decision making. Moreover, it also provided a way to educate the general public about policy decisions and issues. It fostered belief in the efficacy of the system. Legal commentators noted that "[o]pen government is believed to serve as both a light and disinfectant in exposing potential abuse and misuse of power. The deliberation of public policy in the public forum is an important check and balance on self-government."[12] The prodisclosure nature of the OMA prompted one of its sponsors to describe the law, prior to enactment, as "a strong bill now which provides very limited closed meetings" and "very tight, limited exceptions . . . ." See 1976 Journal of the House 2242 (June 24, 1976, remarks of Representative Hollister). To further the OMA's legislative purposes, the Court of Appeals has historically interpreted the statute broadly, while strictly construing its exemptions and impos-ing on public bodies the burden of proving that an exemption exists.[13]

---

[11] Accord 1976 Journal of the Senate 1868 (September 16, 1976, remarks of Senator Welborn); 1976 Journal of the House 2243-2244 (June 24, 1976, remarks of Representative Brown); 1975 Journal of the Senate 2645 (December 16, 1975, remarks of Senator Kildee); 1976 Journal of the House 2242 (June 24, 1976, remarks of Representa-tive Padden).

[12] Osmon, *supra* at 617.

[13] See, e.g., *Wexford Co Prosecutor v Pranger,* 83 Mich App 197, 201, 204; 268 NW2d 344 (1978) (the legislative history indicates that the statute is to be interpreted liberally, while exceptions are to be strictly construed, limiting situations where meetings are not open to the public); *Esperance v Chesterfield Twp,* 89 Mich App 456, 463; 280 NW2d 559 (1979) (the statute must be interpreted to accomplish the legislative goal of openness and accountability); *Ridenour v Dearborn Bd of Ed,* 111 Mich App 798, 802; 314 NW2d 760 (1981) ("the Open Meetings Act must be strictly construed against exemptions to public meetings"); *Booth Newspapers, Inc v Wyoming City Council,* 168 Mich App 459, 466-467; 425 NW2d 695 (1988) (OMA exceptions must be interpreted strictly to meet the legislative goal of openness and

### 3. THE OMA'S PLAIN MEANING

A thorough examination of the legislative intent and purpose places a statute in its historical context and aids a court in interpreting the statute's text. When courts interpret this or any other statute, they must look to the plain meaning of the particular law in question. *Owendale-Gagetown School Dist v State Bd of Ed,* 413 Mich 1; 317 NW2d 529 (1982). In the instant case, the legislative reforms during the 1970s resulted in an OMA with broad inclusive language that required a public meeting for "all decisions of a public body" and "[a]ll deliberations of a public body constituting a quorum of its members . . . ."[14]

The gist of our analysis is whether, on the basis of the OMA's plain meaning, the Presidential Selection Committee (a) constituted a public body that (b) made closed-session decisions and deliberations, and (c) conducted closed-session interviews in violation of the act.

### (A) PUBLIC BODIES

The OMA defines a "public body" to include a

accountability in government); *Detroit News v Detroit,* 185 Mich App 296, 302; 460 NW2d 312 (1990) ("A strict construction must be given to closed-door exceptions in order to limit the situations in which meetings are not opened to the public").

[14] The OMA provides, in pertinent part:

(1) All meetings of a public body shall be open to the public and shall be held in a place available to the general public. All persons shall be permitted to attend any meeting except as otherwise provided in this act. . . .

(2) All decisions of a public body shall be made at a meeting open to the public.

(3) All deliberations of a public body constituting a quorum of its members shall take place at a meeting open to the public except as provided in this section and sections 7 and 8. [MCL 15.263; MSA 4.1800(13).]

"committee, subcommittee, authority, or council, which is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority . . . ."[15]

Consequently, a key determination of the OMA's applicability is whether the body in question exercises governmental or proprietary authority. *Goode v Dep't of Social Services,* 143 Mich App 756, 759; 373 NW2d 210 (1985). In this case, it is beyond question that the University of Michigan Board of Regents is a public body charged by law and financed by Michigan taxpayers to govern an institute of higher education.[16] The selection of a university president is one of the board's most important exercises of governmental authority. If it establishes any form of subcommittee and empowers that subcommittee by "resolution or rule" to exercise this particular governmental authority, then that subcommittee is also a "public body" within the meaning of the act.[17]

The board, however, argues that Regent Brown's actions do not constitute that of a subcommittee

---

[15] MCL 15.262(a); MSA 4.1800(12)(a).

[16] Michigan courts have repeatedly held that our state-financed universities are public institutions that come within the confines of state laws, despite constitutional provisions granting them some degree of autonomy regarding financial and educational matters. See Const 1963, art 8, § 5; see also *Univ of Michigan Regents v Employment Relations Comm,* 389 Mich 96, 107; 204 NW2d 218 (1973) (the constitutional grant of autonomy to the Board of Regents is to be applied to educational matters. "This concern for the educational process . . . does not and cannot mean that they are exempt from all the laws of the state"); *Peters v Michigan State College,* 320 Mich 243; 30 NW2d 854 (1948) (a state university is considered an "incorporated public board," and, as such, subject to the workers' compensation act in spite of the constitutional provisions giving the board control of college funds); *Branum v Univ of Michigan Bd of Regents,* 5 Mich App 134, 138-139; 145 NW2d 860 (1966) (the Board of Regents, in spite of its independence, is a part of state government and subject to the waiver of governmental immunity by the state).

[17] MCL 15.262(a); MSA 4.1800(12)(a). *Herald Co v Davis,* 7 Med L Rptr 2164, 2165 (Saginaw Circuit Court, 1981); see also OAG, 1981-1982, No 6057, p 622 (April 20, 1982).

and, therefore, his activities as chair of the Presidential Selection Committee fall outside the OMA's reach. We do not find this argument persuasive. Essentially, the board argues form over substance. The Legislature did not grant any exception to specific types or forms of committees. Therefore, delegating the task of choosing a public university president to a one-man committee, such as Regent Brown, would warrant the finding that this one-man task force was in fact a public body. As the *Goode* Court observed, "[w]e do not find the question of whether a multi-member panel or a single person presides to be dispositive. Such a distinction carries with it the potential for undermining the Open Meetings Act . . . ." *Id.,* 143 Mich App 759.

Therefore, we hold that the selection of a public university president constitutes the exercise of governmental authority, regardless of whether such authority was exercised by Regent Brown, the nominating committee, the full board, or even subcommittees. Accordingly, this individual or these entities must be deemed "public bodies" within the scope of the OMA. Having established the "public" nature of these bodies, we must now examine the precise actions taken by them and their disposition under the OMA.

### (B) DECISIONS

Section 2(d) of the OMA provides:

"Decision" means a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy. [MCL 15.262(d); MSA 4.1800(12)(d).]

The board insists that the process of reducing the candidate list resulted from recommendations by subquorum groups of regents, the nominating committee of board members, or by Regent Brown acting alone after consultation with individual regents. It maintains that none of these actions constituted formal "decisions" that bound the board because the possibility existed that the board might reconsider their candidate evaluations and reexamine a previously rejected candidate. On each occasion, the board claims that they merely reached a consensus regarding the action that they would take or the candidates that they preferred. In short, the board insists that their actions, in reducing the list of viable candidates, were not subject to the OMA because it did not take action by a "vote" as required under the act's definition of "decision." It maintains that the only decision that required a public meeting was held on June 10, 1988, when the board actually voted to elect Dr. Duderstadt.

The board bases its argument on the misconception that every term within the definition of "decision" is modified by the last two phrases ("on which a vote . . . is required *and* by which a public body effectuates . . . policy") (emphasis added). In other words, the board erroneously concludes that a determination or an action, for example, will only constitute a "decision" under the OMA if that activity is one "on which a vote . . . is required and by which a public body effectuates . . . policy."

This interpretation is substantially flawed, however, when one considers the third activity included within the definition—a vote. Under the board's construction, the definition of "decision" would include a matter "on which a vote . . . is required and by which a public body effectuates

. . . policy." Defendant's disjointed and strained
reading of the statute is nonsensical. It is a gen-
eral rule of statutory construction that courts
must construe statutes to avoid rendering words in
the statute mere surplusage or nonsense. *Stowers
v Wolodzko,* 386 Mich 119, 133; 191 NW2d 355
(1971). A reasonable construction of the definition
interprets the last phrase ("by which a public body
effectuates . . . policy") as modifying the whole
definition. The preceding phrase ("on which a
vote . . . is required") modifies only those clauses
that follow the term "disposition."[18]

The board also contends that open meetings are
only required when "formal" voting occurs. The
defendant has once again misconstrued the stat-
ute. As currently worded, the OMA's plain meaning
clearly applies to "all decisions" by public bodies.
The act does not modify the word "vote" by the
term "formal." If this provision were now read
into the current OMA, it would resurrect the
amended 1968 statute, which has been discredited
by the Legislature. The board cannot read into the
statute what the Legislature has seen fit to ex-
clude.

Regardless of how the Presidential Selection

---

[18] Under this interpretation, each of the following activities are
deemed a "decision" under the OMA:

    [a.] a determination . . . by which a public body effectuates
. . . policy;
    [b.] [an] action . . . by which a public body effectuates
. . . policy;
    [c.] [a] vote . . . by which a public body effectuates
. . . policy;
    [d.] [a] disposition upon a motion, proposal, recommendation,
resolution, order, ordinance, bill, or measure on which a vote
by members of a public body is required and by which a public
body effectuates or formulates public policy. [MCL 15.262(d);
MSA 4.1800(12)(d).]

Committee wishes to categorize its actions, the fact remains that the board adopted a procedure that violated the OMA. The OMA does not contain a "voting requirement" or any form of "formal voting requirement." Consequently, arguments that the Presidential Selection Committee's actions were a consensus building process, rather than a mere vote or "formal" vote, are irrelevant. Furthermore, any alleged distinction between the committee's consensus building and a determination or action, as advanced in the OMA's definition of "decision," is a distinction without a difference. Even members of the committee acknowledged that its "round-the-horn" decisions and conferences achieved the same effect as if the entire board had met publicly, received candidate ballots, and "formally" cast their votes.[19] Moreover, testimony of various regents even raises the question whether the board did in fact vote through the use of tallies and a rating system.

The only part of the decision-making process that occurred in public was the final step: Dr. Duderstadt's selection from a list of one. The Presidential Selection Committee did not make the decision to appoint Dr. Duderstadt publicly, it merely announced the decision publicly. Dr. Duderstadt's elevation to the position of university president was a fait accompli by the commencement of the public meeting held on June 10, 1988.

In sum, the board's actions must be considered closed session decisions under the OMA. Any other interpretation of its actions would contradict the act's letter and spirit. This Court's failure to recognize this fact would undermine the legislative intent to promote responsible and open government.

---

[19] See deposition of Regent Power, pp 52-53.

(C) DELIBERATIONS

Although § 3(3) of the OMA requires a public body to hold all deliberations at an open meeting, § 8(f) does permit closed session deliberations "[t]o review the specific contents of an application for employment or appointment to a public office if the candidate requests that the application remain confidential."[20] The OMA further provides, however, that "all interviews by a public body for employment or appointment to a public office shall be held in an open meeting pursuant to this act."[21]

The board maintains that this "application exception" permitted it to withhold the candidates' identities and to justify closure of discussions comparing the candidates' qualifications for the purpose of reducing the list of viable individuals. The board's deliberation, however, far exceeded the exemption's scope. The OMA exception permitting closed sessions to review the "specific contents" of an application would entail discussions about the applicant's qualifications on the basis of information contained in the application.

In the instant case, the Court of Appeals construed the "specific contents" exemption narrowly and held that the OMA permitted closed sessions only to review personal matters contained in a candidate's application. We agree. Considering the OMA's prodisclosure nature, the requirement to strictly construe exemptions and the mandate for open candidate interviews, it is reasonable to assume that the Legislature intended this exemption to be a limited compromise, allowing privacy rights to dictate in instances where boards were

[20] MCL 15.268(f); MSA 4.1800(18)(f).
[21] Id.

not engaged in decision-making activities.[22] Here we agree with the panel that the board went beyond this limitation and made reduction decisions under the guise of this exemption. Clearly, however, the OMA requires that "all decisions of a public body" be made in public. Consequently, the act mandates that the Presidential Selection Committee make any reduction decisions in public.

With regard to the interviews, or "visits" as termed by the board, there is no statutory exception permitting a subcommittee to conduct closed interviews. On the contrary, the Legislature expressly mandated open interviews. In doing so, the Legislature must have recognized that candidates' identities would become public, and that it was in the greater public interest to know the qualifications of candidates for public positions and the hiring procedures of public officials.

Therefore, we hold that the Board of Regents is a public body that made closed session deliberations and decisions and held private interviews in violation of the OMA.

### B. FREEDOM OF INFORMATION ACT

The Freedom of Information Act, MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.,* protects a citizen's right to examine and to participate in the political process. It requires public disclosure of information regarding the formal acts of public officials and employees. This Court has stated that the act mandates "[a] policy of full disclosure . . . ." *Swickard v Wayne Co Medical Examiner,* 438 Mich 536, 543; 475 NW2d 304 (1991).

However, the FOIA provisions requiring disclosure are not absolute. The act outlines several

---

[22] This exemption remains in force even after public disclosure is required under other sections of the act.

instances in which public records may be exempt from disclosure. MCL 15.243; MSA 4.1801(13). These exemptions must be narrowly construed. See *Swickard, supra* at 544; *Evening News Ass'n v Troy,* 417 Mich 481, 503; 339 NW2d 421 (1983). In addition, the burden of proving the need for an exemption rests on the public body asserting its application. *Swickard* at 544; see *Nowack v Auditor General,* 243 Mich 200, 203-204, 208-209; 219 NW 749 (1928); *Booth Newspapers, Inc v Muskegon Probate Judge,* 15 Mich App 203, 205; 166 NW2d 546 (1968).

When interpreting the various FOIA provisions, we must again follow the statute's plain meaning. *Owendale-Gagetown School Dist, supra.* In the instant case, the Presidential Selection Committee asserts that the travel expense records of regents who met with various presidential candidates should be privileged under § 13(1)(a) of the FOIA. This exemption allows a public body to conceal public records containing "[i]nformation of a personal nature where the public disclosure of the information would constitute a clearly unwarranted invasion of an individual's privacy." MCL 15.243(1)(a); MSA 4.1801(13)(1)(a).

As evident from the statute, under a plain-meaning analysis of § (13)(1)(a), two factors must exist to exempt information from public exposure. First, the information sought must be of a "personal nature," and, second, the disclosure of such information must constitute a "clearly unwarranted" invasion of privacy. *Swickard, supra.*

## 1. PERSONAL NATURE

In determining whether the information withheld is of a "personal nature," "the customs, mores, or ordinary views of the community" must be

taken into account. *Swickard, supra* at 547. The Court of Appeals failed to consider this "personal nature" test as a separate inquiry as mandated by *Swickard.* Had it done so, it would have been compelled to determine that the information being sought by plaintiff was not "personal" in nature.

There exists no custom, mores, or ordinary view of the community that would warrant a finding that the travel expense records of a public body constitute records of a personal nature. The board, however, asserts that the travel expense reports of the regents might lead to information concerning the candidates that is in fact personal (i.e., the actual names of those individuals considered in the presidential search). We find that the FOIA "personal nature" exemption does not prohibit the disclosure of information that could *conceivably* lead to the revelation of personal information. As the United States Supreme Court stated, when examining a disclosure exemption in the federal Freedom of Information Act similar to § 13(1)(a), the exception is "directed at threats to privacy interests more palpable than mere possibilities." *Dep't of Air Force v Rose,* 425 US 352, 380, n 19; 96 S Ct 1592; 48 L Ed 2d 11 (1976).

If the board's arguments are upheld, they could lead to undesired consequences and precedents. Its arguments welcome abuse of this prodisclosure legislation by misconstruing the statutory exemptions. In short, the standard advanced by the board permits a party to assert a myriad of scenarios under which the disclosure of one particular type of information might lead someone to discover other material deemed "personal." By expanding the exemption to protect information that may or may not lead to the exposure of personal material, the board ignored the requirement that courts must construe FOIA exceptions narrowly.

Therefore, under our analysis, we hold that the FOIA's § (13)(1)(a) exemption does not apply in the instant case because the travel expense records fail to survive scrutiny under the first prong of the two-part test required by this provision.

### C. CONSTITUTIONAL CLAIM

The board contends that application of the OMA to governing boards of public universities in the manner prescribed by the Court of Appeals violates the autonomy vested in such bodies by the Michigan Constitution. Const 1963, art 8, § 5. For the reasons discussed below, we reject that argument.

### 1. FAILURE TO PRESERVE CLAIM

The board first raised its constitutional claim in its appeal to this Court; the issue was neither presented to nor evaluated either by the trial court or the Court of Appeals. Issues raised for the first time on appeal are not ordinarily subject to review.[23] In addition, there exists a general presumption by this Court that we will not reach constitutional issues that are not necessary to resolve a case. *Taylor v Michigan,* 360 Mich 146, 154; 103 NW2d 769 (1960).

---

[23] This Court has repeatedly declined to consider arguments not presented at a lower level, including those relating to constitutional claims. *In re Forfeiture of Certain Personal Property,* 441 Mich 77, 84; 490 NW2d 322 (1992); *Butcher v Treasury Dep't,* 425 Mich 262, 276; 389 NW2d 412 (1986); *Dagenhardt v Special Machine & Engineering, Inc,* 418 Mich 520; 345 NW2d 164 (1984); *Ohio Dep't of Taxation v Kleitch Bros, Inc,* 357 Mich 504, 516; 98 NW2d 636 (1959). We have only deviated from that rule in the face of exceptional circumstances. *Perin v Peuler,* 373 Mich 531, 534; 130 NW2d 4 (1964) (issue resolution was necessary to quell confusion generated by the Court's earlier opinions); *People v Snow,* 386 Mich 586, 591; 194 NW2d 314 (1972) (addressed the issue to prevent a miscarriage of justice). There exist no exigent circumstances in this case that require our review of the board's constitutional argument.

On the basis of the arguments articulated above, we refuse to consider the board's constitutional argument.

### III

On the basis of an examination of the Open Meetings Act and the Freedom of Information Act, we rule that both acts were violated. Presidential searches at the state's public universities must be conducted with due regard to the OMA's requirement of open meetings for all public body deliberations, decisions, and interviews. Travel expense records connected with these searches are not exempt from an FOIA request.

Therefore, we remand this case to the circuit court for entry of a judgment providing injunctive relief and compelling disclosure in conformity with this opinion.

CAVANAGH, C.J., and LEVIN and BRICKLEY, JJ., concurred with MALLETT, J.

BOYLE, J. (*concurring in part and dissenting in part*). I concur with the Court's conclusion that the University of Michigan Board of Regents violated the Open Meetings Act in its search for a new president.[1] I write separately, however, because I cannot agree with the majority's determination that the Open Meetings Act requires that the entire presidential selection process be conducted in public view.[2] I would hold that the OMA does not compel that information gathered in the initial

---

[1] I also concur with the majority that the Board of Regents' constitutional argument, which was raised for the first time in this Court, has not been properly preserved for appellate review. *Ante* at 234.

[2] Similarly, I cannot agree with Justice RILEY's finding that the Board of Regents is entirely exempt from the Open Meetings Act and that, pursuant to the Michigan Constitution, only its "formal" sessions need be open to the public. The board does not assert that it is

candidate screening process be disclosed to the public, nor does it dictate the revelation of a candidate's identity without consent or before the scheduling of a public interview.

Finally, I do not agree that the Freedom of Information Act was violated by redacting the final destination on the search committee's travel expense forms.

I

It is beyond question that the Open Meetings Act, MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.*, and the Freedom of Information Act, MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.*, were enacted by the Legislature to promote openness and accountability in government. As noted by the majority, the ultimate goal of the Legislature in enacting the OMA was to educate the general public regarding government decision making, while at the same time creating a responsible and competent public body. The success of the act is reflected in its high rate of support and compliance among a majority of public bodies at both the state and local level.[3] Before concluding, however, that every endeavor of a public body in the context of hiring must be conducted in full view of the public under the auspices of the OMA and the FOIA, it is essential to examine the purpose and boundaries of those acts.

A

The Open Meetings Act requires that all meetings, decisions, and quorum deliberations of a public body take place at a forum open to the

exempt from the OMA, but, rather, that the act "as applied and construed by the Court of Appeals to require premature disclosure of candidate names . . . will prevent the Board from exercising its best Constitutional judgment as to how to elect a president."

[3] Wernet, *A guide to the hiring process for public bodies under Michigan's Open Meetings Act,* 63 Mich B J 1040 (1984).

public.[4] I agree with the Court that, in this case, the President Selection Committee was a "public body" as defined by the act because it was empowered to select the university's new president.[5] The Board of Regents appointed "itself" the President Selection Committee. The committee was, in reality, the Board of Regents and thus could not deliberate and recommend to itself, the board, a list of final candidates for public interview without violating the OMA provision requiring that all "decisions" of a quorum of a public body be conducted at a public meeting. In my judgment, how-

---

[4] MCL 15.263; MSA 4.1800(13) provides in pertinent part:

(1) All meetings of a public body shall be open to the public and shall be held in a place available to the general public. All persons shall be permitted to attend any meeting except as otherwise provided in this act. . . .

(2) All decisions of a public body shall be made at a meeting open to the public.

(3) All deliberations of a public body constituting a quorum of its members shall take place at a meeting open to the public except as provided in this section and sections 7 and 8.

The significance of § 3 is realized by examining § 2(a), which defines "public body" as

any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, which is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function . . . . [MCL 15.262(a); MSA 4.1800(12)(a).]

[5] Regent Brown, the chair of the President Selection Committee, testified that although the committee did not receive an express charge from the board, its purpose "was understood. We were supposed to find a president." The committee, "delegated" with the task of, in Chairman Brown's words, finding a president for the university, became a "public body" within the meaning of the OMA because its membership was comprised of the entire Board of Regents. Thus, any convening of the committee at which a quorum of its members was present or participated for the purpose of deliberating toward or rendering a decision on the selection of a president, was required by the act to be open to the public unless it fell within a § 8 closed-session exemption. See OAG, 1977-1978, No 5183, pp 21, 40 (March 8, 1977).

ever, despite the intent to read the OMA broadly, and with limited exceptions, 1976 Journal of the House 2242; *Wexford Co Prosecutor v Pranger,* 83 Mich App 197, 201; 268 NW2d 344 (1978), the Legislature did not intend that the act apply to every venture undertaken by a public body in the context of hiring.

The compiling of a list of names, reviewing qualifications, and identifying a limited number of persons for interviews to further assess their capability and interest in the position, are tasks that are ministerial in nature and not "public business" within the purview of the OMA. Screening from the original inventory of 250 names, a list of thirty potential candidates who were more qualified than the others was not a public body meeting, deliberation, or decision effectuating public policy. Whether performed by administrative staff, a third party, or the Board of Regents itself, does not change the technical and qualitative nature of the task. At no time during this initial screening process was there any "decision" by any person or public body to eliminate or remove any person from the list of 250 potential candidates. Rather, the assignment involved the gathering and sorting of submitted names to locate those persons who might be best qualified for the position of president of the university.

Tapering the list from the thirty most qualified "potential" candidates to twelve "actual" candidates was executed by the candidates themselves and not through any action of a public body or official. These twelve candidates expressed an interest in the position and, when asked, requested that their preliminary candidacy remain confidential. Although no "applications" per se were submitted, a logical inference follows that when the potential candidates affirmed an interest in pursu-

ing the position, they became "applicants" within
the meaning of the OMA. Pursuant to MCL
15.268(f); MSA 4.1800(18)(f), authorizing closed
meetings by the full public body to deliberate and
review applications for appointment when the ap-
plicant requests confidentiality, the board met in a
private session to evaluate the twelve candidates'
curricula vitae. Hence, no violation of the OMA by
the President Selection Committee or the board
occurred at this stage of the selection process.

Although § 8(f) enables a public body to meet in
closed session to review the specific contents of an
employment application, the second sentence of
the same provision provides that all interviews by
a public body for employment shall be held in an
open meeting.[6] The tension between the sentences
is apparent when a public body, authorized to
review and discuss a candidate's application at a
closed meeting, is unable to render any "decision"[7]
concerning the candidate without violating the
open meeting requirement that all "decisions" of
the public body be made in an open forum. In an
attempt to reconcile this conflict, it has been sug-

---

[6] Section 8(f) provides that a public body may meet in closed session

[t]o· review the specific contents of an application for employ-
ment or appointment to a public office if the candidate requests
that the application remain confidential. However, all inter-
views by a public body for employment or appointment to a
public office shall be held in an open meeting pursuant to this
act.

[7] The act defines a "decision" of a public body subject to the open
meetings requirement as

a determination, action, vote, or disposition upon a motion,
proposal, recommendation, resolution, order, ordinance, bill, or
measure on which a vote by members of a public body is
required *and* by which a public body effectuates or formulates
public policy. [MCL 15.262(d); MSA 4.1800(12)(d). Emphasis
added.]

gested that the public body create a committee composed of outside members or a subquorum of public officials, and charge the group with recommending a final list of candidates who are most qualified and suited for the position. As a nonpublic body without authority to exercise a government function, it has been contended that the committee would be free to meet in private and to conduct confidential interviews with some or all of the candidates to facilitate the development of its recommendation of final candidates to the full public body. See Wernet, *A guide to the hiring process for public bodies under Michigan's Open Meetings Act,* 63 Mich B J 1040 (1984); OAG, 1977-1978, No 5183, pp 21, 40 (March 8, 1977).

The President Selection Committee was not a committee empowered solely with authority to advise or make a recommendation to the full board because, as indicated above, the committee was "itself" the board. The committee therefore could not accomplish in subquorum groups what it was prohibited by the OMA from performing as a quorum public body. At the juncture in the process when the board conducted subquorum private interviews, deliberations, and decisions concerning the twelve applicants for employment, it violated the mandates of the OMA.[8] The board does not deny, and it is unclear from the record, whether a quorum of the regents as President Selection Committee members may have interviewed any single applicant, albeit at different times. Nevertheless, even absent a quorum of regents interviewing any

[8] To conform with the OMA's requirements, after reviewing the twelve applications in the closed meeting, the board could have created an advisory committee composed of a subquorum of regents to recommend from that list, a number of finalists for the position. As noted above, the advisory committee could conduct private interviews with the candidates and meet in closed forums to facilitate their recommendation process.

one candidate, the board violated the OMA's public interview requirement. The Attorney General has determined that the Open Meetings Act

> is violated when a committee comprised of [a] quorum of the public body, or subcommittees of a public body, which constructively constitute a quorum of the public body, collectively deliberate on or render decisions on public policy in a closed session on matters which do not fall within the provisions of the Open Meetings Act, *supra,* § 8, allowing a closed meeting. The fact that these committees are physically separated while they deliberate on public business does not insulate them from the requirements of the Open Meetings Act, *supra.* [OAG, 1979-1980, No 5788, pp 1015, 1017 (September 23, 1980).]

Thus,

> [w]hile a committee or subcommittee of a public body which constitutes less than [a] quorum of the public body, and is purely advisory in nature, is not subject to the Open Meetings Act, *supra,* a public body which divides itself into subcommittees of less than quorum to collectively deliberate towards the resolution of public business, is in fact, acting as a "public body." A public body may not avoid violating the Act by clothing itself as a sham advisory committee or subcommittee of less than a quorum. [*Id.* at 1016.]

Similar to the Attorney General opinions concerning the division of a public body into subquorum committees, the Court of Appeals in *Booth Newspapers, Inc v Wyoming City Council,* 168 Mich App 459, 472; 425 NW2d 695 (1988), upheld the trial court's finding that the city council violated the OMA when it divided into subquorum groups to deliberate matters of public policy it normally would have been required to discuss at an open

meeting. The Court found that a "constructive quorum" actually existed, and, thus, its deliberations and actual decisions were subject to the act. The act would also be violated if a public body simply labeled a meeting a "conference" and refrained from engaging in any actual deliberations or discussion in an attempt to utilize the conference exemption contained in § 3(10).[9] OAG, 1981-1982, No 6074, pp 662, 664 (June 11, 1982); OAG, 1979-1980, No 5433, p 29 (January 31, 1979).

In this case, there was no express finding of fact by the trial court that the regents' subquorum interviews and discussions were designed to circumvent the oma's requirements. Conversely, several regents, including Regent Brown, testified that the interviews and subsequent feedback discussions were conducted in this format to comply with the act's subquorum mandates.[10] Whether viewed as "avoiding" the act or "complying" with the act, is, in this factual presentation, a distinction without a difference. The overall purpose of the interviews and follow-up discussions were to narrow the list of candidates for final consideration.[11] Unable to make an advisory recommendation to itself because its membership included the entire public body, the President Selection Committee, as a public body, was required by the oma to conduct open interviews and decisions. The recommendation by Regent Brown, as chair of the committee, to further interview five candidates in private with participation from the three advisory groups and, finally, to interview two candidates in public was, in reality, the general consensus and

---

[9] MCL 15.263(10); MSA 4.1800(13)(10) provides that the act "does not apply to a meeting which is a social or chance gathering or conference not designed to avoid this act."

[10] See, for example, Brown deposition, p 60 and Roach deposition, p 9.

[11] Brown deposition, p 44.

view of the entire board after discussing the candidates in several closed meetings and phone conversations with all the regents.[12] Such decision making violated the act by not taking place in a public forum. MCL 15.263(2); MSA 4.1800(13)(2). See also OAG 1979-1980, No 5445, p 57 (February 22, 1979).

Read literally, the act entitles a public body to meet in closed sessions to review an advisory committee's recommendation of finalists or a candidate's application.[13] In any event, the decision concerning the disposition of a final candidate must be conducted at a forum open to the general public. However, while I agree with the conclusion that the process selected by the Board of Regents in this case ultimately violated the mandates of the OMA, the identity of candidates recommended by a true advisory committee need not be disclosed until a final list of candidates is recommended to the full public body.

The majority opinion rests on the explicit premise that the prodisclosure purpose of the act requires broad application of the OMA to all phases of the public hiring process.[14] This approach overlooks the fact that, as enacted, the OMA is actually less comprehensive than the act originally proposed. The initial draft of the act would have included within the definition of a public body "any . . . state or local government entity to make recommendations concerning the exercise of

[12] *Id.*

[13] A public body may meet in a closed session even after a public interview to evaluate the candidate's application, although the purpose behind the exemption, confidentiality, no longer exists at that point. Wernet, *supra* at 1042.

[14] To read the OMA in the way the plaintiff suggests would require that every person involved in the procedure conduct a public meeting to discuss each thought process. It is difficult indeed to define a "public purpose" in the disclosure of all 250 names.

governmental authority." SB 920, § 2(a). The applicability of the act to such recommending entities was stricken by the first amendment of the bill. See 1975 Journal of the Senate 2400. The Attorney General subsequently concluded that the OMA

> does not apply to committees and subcommittees of public bodies which are merely advisory or only capable of making "recommendations concerning the exercise of governmental authority." These bodies are not legally capable of rendering a "final decision." In other words, a subcommittee which can only make recommendations to the public body for final decision is not required to hold its committee meetings in public hearings. . . . [W]here such [a] subcommittee contains the entire body of the "public body" which it serves, it would be a violation of the Act to allow such subcommittees to meet in closed session. [OAG, 1977-1978, No 5183, *supra,* p 40. See also OAG, 1979-1980, No 5505, pp 221-222 (July 3, 1979).]

Having specifically considered and rejected the idea that "recommendations" by a committee or subcommittee of a public body concerning the exercise of government authority be included in the act's definition of a "public body," it can safely be concluded that the Legislature intended to exempt such entities from the OMA's public forum requirements. The public body could create such an advisory committee to maintain the confidentiality of preliminary candidates and to recommend a pool of finalists for its consideration. Although the OMA imposes no literal restrictions or reporting requirements on advisory committees, to effectuate the purpose of the OMA, the committee should provide with its recommendation reasons for its recommendation and the procedures and methods used in reaching it. OAG, 1979-1980, No 5788, *supra,* pp 1017-1018. As always, the public

body would be free to reject, accept, or modify the
committee's nonbinding recommendation.

B

I also disagree with the majority's conclusion
that the OMA requires that a public body disclose
the identity of a candidate yet allows it to meet in
a closed session to review "personal matters con-
tained in a candidate's application." *Ante* at 230.[15]
To read the OMA in this manner is nonsensical.
First, it is a violation of an applicant's civil rights
under the Civil Rights Act for an employer to
consider a prospective employee's "religion, race,
color, national origin, age, sex, height, weight, or
marital status" with respect to employment. MCL
37.2202(1)(a); MSA 3.548(202)(1)(a). Additionally,
an employer is prohibited from soliciting such
information on the employment application. MCL
37.2206; MSA 3.548(206). Thus, it is incomprehen-
sible to read the OMA as permitting the regents to
conduct a closed meeting to consider personal
information that it can neither obtain on an em-
ployment application nor consider in making its
decision, absent a violation of the candidate's civil
rights. Second, the position of president of a major
public university customarily attracts well-quali-
fied, prominent, and distinguished persons. The
information submitted and reviewed generally in-
cludes the candidate's curriculum vitae, rather

---

[15] Section 8(f) provides that a public body may meet in closed
session

> [t]o review the specific contents of an application for employ-
> ment or appointment to a public office if the candidate requests
> that the application remain confidential. However, all inter-
> views by a public body for employment or appointment to a
> public office shall be held in an open meeting pursuant to this
> act.

than an employment "application" per se filled out by a hopeful applicant. It is only logical to assume that the Legislature understood that in hiring situations for high level positions, the most sensitive information, and that most in need of being defined as confidential, is the candidate's identity. The Legislature's highly sophisticated experience in such matters must be deemed to have contemplated that once the identity of a candidate who is generally well-known and respected within a given community is made public, the candidate's biographical resume is often an open book and easily obtainable. Given that the result of such disclosure is to serve notice upon the candidate's current employer that the person is contemplating other employment and to discourage the best candidates from pursuing an interest in the position, it strains credulity to believe that the Legislature intended a result so inconsistent with public interest and the hiring needs of public bodies.

For the above reasons, the OMA should be construed to grant a public body the power to refuse to disclose the identity of a preliminary candidate when confidentiality is requested and to permit the review and deliberation of the candidate's qualifications to occur in a closed meeting. If recommended as a finalist for the position, the candidate should be afforded the opportunity to withdraw before a formal public recommendation to the hiring body. Any candidate who consents to further consideration by the full public body must be deemed to have waived the right to privacy, yielding to the public's right to know the qualifications of the candidate and satisfying the act's requirement that where the public body reserves to itself the final decision for appointment to certain levels of employment, without exception, those interviews must be conducted in public.

OAG, 1977-1978, *supra,* pp 38-39; Wernet, *supra,* p 1042.

The balancing of the public's interest in the qualities of candidates and in the process by which they are chosen, against the interest of the university in attracting the finest candidate for the position is best achieved by reading the act in the manner suggested.

C

The Freedom of Information Act, MCL 15.231 *et seq.;* MSA 4.1801(1) *et seq.,* provides:

> It is the public policy of this state that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and public employees, consistent with this act. The people shall be informed so that they may fully participate in the democratic process.

The act promotes a policy of full disclosure, *Swickard v Wayne Co Medical Examiner,* 438 Mich 536, 543; 475 NW2d 304 (1991). However, the FOIA is not absolute and affords an exception from disclosure of "[i]nformation of a personal nature where the public disclosure of the information would constitute a clearly unwarranted invasion of an individual's privacy." MCL 15.243(1)(a); MSA 4.1801(13)(1)(a). I agree with the majority that the exemptions must be narrowly construed and that the public body bears the burden of proving the need for the exemption. *Ante* at 232. However, I cannot agree with the determination that the information sought by the plaintiff newspaper was not of a personal nature and thus not exempt from disclosure in this situation.

The plaintiffs requested copies of all travel ex-

pense vouchers submitted for reimbursement for travel expenses by the regents or other personnel for presidential interview expenses. The university complied and forwarded copies of its records concerning the dates of travel, the name of the regent traveling, the hub-city destination,[16] and the total amount and breakdown of expenses for each trip. Citing § 13(1)(a), the final destinations were redacted from the travel expense forms in an effort to protect the confidentiality of the candidates' identities.

As noted by Justice CAVANAGH in the lead opinion in *State Employees Ass'n v Dep't of Management & Budget,* 428 Mich 104, 123; 404 NW2d 606 (1987), and quoted with approval by Justice RILEY in *Swickard, supra* at 546:

> The Legislature made no attempt to define the right of privacy [in § 13(1)(a)]. We are left to apply the principles of privacy developed under the common law and our constitution. The contours and limits are thus to be determined by the court, as the trier of fact, on a case-by-case basis in the tradition of the common law. Such an approach permits, and indeed requires, scrutiny of the particular facts of each case, to identify those in which ordinarily impersonal information takes on "an intensely personal character" justifying nondisclosure under the privacy exemption.

Although the release of a person's name, without more, is generally not considered an invasion of privacy, Justice RYAN in *Kestenbaum v Michigan State Univ,* 414 Mich 510, 547; 327 NW2d 783 (1982), observed that such a predicament may exist and left "for another day the question whether, in certain unusual circumstances, ordinarily impersonal information might take on an intensely per-

---

[16] New York and Chicago were two such axis cities.

sonal character." This case presents such a situation.

The Court of Appeals upheld the trial court's finding that "disclosure of the regents' travel destinations would, with little further investigation, reveal the candidates' identities, thereby constituting a clearly unwarranted invasion of their privacy." 192 Mich App 574, 586; 481 NW2d 778 (1992). I agree. As previously recognized by this Court in *Kestenbaum, State Employees Ass'n,* and *Swickard,* the FOIA does not require blanket application without regard to the factual context.

Each of the twelve candidates, comprised of presidents of other universities and persons holding equally responsible positions, requested that their preliminary consideration as president of the University of Michigan remain confidential. The trial court found that disclosure of the regents' final travel destination was tantamount to revealing the identity of the specific candidate under consideration. Divulging information that easily led to the identity of the prospective employee was equivalent to releasing information that was "personal, intimate, or embarrassing" to the applicant, *Swickard* at 547. The fear of reprisal from a current employer or trepidation that "public knowledge of nonselection would stigmatize them as having been weighed and found wanting and thereby blight their future careers as educational administrators," 192 Mich App 587, was exactly the type of unwarranted invasion of privacy causing injury that the candidates sought to avoid. Thus, revealing information that would easily lead to the candidate's identity as an applicant for the position constituted a clearly unwarranted invasion of promised privacy. See *Core v United States Postal Service,* 730 F2d 946 (CA 4, 1984).

The majority's fear that to rule otherwise in this

case could lead to "undesired consequences and precedents" fostering a "myriad of scenarios under which the disclosure of one particular type of information might lead someone to discover other material deemed 'personal' " to an individual, is both unwarranted and unfounded. *Ante* at 233. The potential risk or opportunity for abuse has never alone been a sufficient and valid reason for interpreting a statute in a particular manner. The intent of the Legislature in exempting from the FOIA information of a personal nature that would clearly invade an individual's privacy was to protect individuals from suffering injury or embarrassment from such disclosure. In this case, the information that was personal and intimate to the individuals was their identities as employment applicants. I see no clear error in the Court of Appeals affirmance of the trial court's denial of the plaintiffs' FOIA request and would hold that the redacting of the final destination on the university's travel expense forms was not a violation of the act. Moreover, there has been no suggestion that the expenses were not justified, a matter which, if claimed, would permit in camera inspection by the trial court to balance the taxpayers' interest in the validity of tax dollars expended against privacy exemptions under the FOIA. *Nicita v Detroit,* 194 Mich App 657; 487 NW2d 814 (1992).

II

In sum, I would hold that the Open Meetings Act does not compel that information gathered in the initial presidential screening process be disclosed to the public, nor does it dictate the revelation of a candidate's identity without consent or before the scheduling of a public interview. Additionally, I would uphold the lower courts' finding

that the Freedom of Information Act was not violated by redacting the final destinations on the regents' travel expense forms.

LEVIN, J., concurred with BOYLE, J., except with respect to part I(C).

RILEY, J. (*dissenting*). Because I find the application of the Open Meetings Act[1] and the Freedom of Information Act[2] to governing boards of public universities during the selection of university presidents violates the autonomy vested in the boards by the Michigan Constitution and warrants review by this Court, I respectfully dissent.

I

The majority refuses to examine the clear constitutional issue presented in the instant case because defendant did not raise the issue until appeal. The majority correctly notes that "[i]ssues raised for the first time on appeal are not ordinarily subject to review." *Ante* at 234. Nevertheless, the instant case presents a significant issue, which is necessary to the correct resolution of the case and may be resolved without further action. Hence, this Court has the discretion to review the constitutional issue. See, e.g., *Dation v Ford Motor Co,* 314 Mich 152, 161; 22 NW2d 252 (1946); *Perin v Peuler,* 373 Mich 531, 534-535; 130 NW2d 4 (1964); *Felcoskie v Lakey Foundry Corp,* 382 Mich 438, 442; 170 NW2d 129 (1969).[3] The Court is not obliged to stand idle when a controversy before it

[1] MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.*

[2] MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.*

[3] Furthermore, in my view, the exercise of the Court's discretion is compelled in this case because the Court is presented with "a significant constitutional question . . . ." *People v Blunt,* 189 Mich App 643, 646; 473 NW2d 792 (1991). See also *Dation, supra* (examining a claim that the workers' compensation act violated due process for first

involves vital issues regarding the very structure of state government. Indeed, this Court did not hesitate to declare, without a case or controversy and sua sponte, that the OMA would be unconstitutional if applied to this Court. *In re 1976 PA 267,* 400 Mich 660; 255 NW2d 635 (1977).[4]

II

The Michigan Constitution confers an independent governmental status on its public universities and their boards of education, and grants the boards the exclusive power to elect their presidents:

> The regents of the University of Michigan and their successors in office shall constitute a body corporate known as the Regents of the University of Michigan . . . . Each board shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds. Each board shall, as often as necessary, elect a president of the institution under its supervision. [Const 1963, art 8, § 5.][5]

This Court has long held that "[t]he object of construction, as applied to a written constitution, is *to give effect to the intent of the people adopting it.*" 1 Cooley, Constitutional Limitations (8th ed), p

time on appeal); *People v DeGraffenreid,* 19 Mich App 702, 715; 173 NW2d 317 (1969) (holding that in some cases a court is "obliged to" grant a criminal defendant relief if a constitutional error occurred at trial even if the defendant did not assert such a right at trial); *People v Davis,* 181 Mich App 354, 355; 448 NW2d 842 (1989) (examining an ex-post-facto claim for the first time on appeal).

[4] Furthermore, because as found by both the majority and Justice Boyle, the regents undoubtedly violated the OMA and the FOIA in some fashion, the doctrine that the Court should not reach constitutional issues that are unnecessary to the resolution of a case is not invoked.

[5] See also Const 1963, art 8, § 6.

124. The primary source for ascertaining the original understanding of the constitution is its plain meaning as understood by its ratifiers at the time of its adoption. *Committee for Constitutional Reform v Secretary of State,* 425 Mich 336, 342; 389 NW2d 430 (1986).[6] This is so because the fundamental charter " 'is made for the people and by the people,' " *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), and " 'does not derive its force from the convention which framed, but from the people who ratified it . . . .' " *Id.,* quoting Cooley, *supra* (6th ed), p 81.

Often, however, "[w]e cannot understand these provisions unless we understand their history . . . ." Cooley, *supra,* p 132. If so, "to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered." *Traverse City School Dist, supra* at 405.[7] Thus, we should expound the constitution "according to its own tenor, in the light of such previous historical facts as may legitimately aid to elucidate it." *People ex rel Twitchell v Blodgett,* 13 Mich 127, 142 (1865) (CAMPBELL, J.). Therefore, we may " 'endeavour to place ourselves in the position of the framers of the Constitution, and ascertain what was meant at the time . . . .' " *Committee for Constitutional Reform, supra* at 342, quoting *Pfeiffer v Detroit Bd of Ed,* 118 Mich 560, 564; 77 NW 250 (1898). See also *People v Thompson,* 424

---

[6] In other words, " '[t]he interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.' " *Committee for Constitutional Reform, supra* at 342, quoting *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971).

[7] See also *People v Harding,* 53 Mich 481, 485; 19 NW 155 (1884); *Kearney v Bd of State Auditors,* 189 Mich 666, 673; 155 NW 510 (1915); *Committee for Constitutional Reform, supra* at 405.

Mich 118, 125-126; 379 NW2d 49 (1985).[8] Furthermore, due deference to contemporaneous or longstanding interpretations of the constitution by this Court is warranted.[9]

These traditional rules of constitutional construction are essential: "The literal construction of the words, without regard to their obvious purpose of protection, is to make the constitutional safeguard no more than a shabby hoax, a barrier of words, easily destroyed by other words. . . . A constitutional limitation must be construed to effectuate, not to abolish, the protection sought by it to be afforded." *Lockwood v Comm'r of Revenue,* 357 Mich 517, 556-557; 98 NW2d 753 (1959). Thus, a thorough examination of the historical origins of the constitutional provision in question is indispensable to the proper disposition of the instant case and the integrity of the constitution.

### III

The supreme law of the State of Michigan has long conferred a unique constitutional status upon

[8] That the Court, with some hesitation, may examine "the proceedings of the constitutional convention [to] endeavor to discover the probable intention of the framers of the constitution as we now find it, is well settled . . . ." *Blodgett, supra* at 165 (COOLEY, J.). Strong reliance on such records, however, is appropriate only in the absence of clear constitutional language or "when we find in the debates a recurring thread of explanation binding together the whole of a constitutional concept." *Regents of Univ of Michigan v Michigan,* 395 Mich 52, 60; 235 NW2d 1 (1975). See also *Committee for Constitutional Reform, supra* at 341.

[9] "Indeed, where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention." [*McPherson v Secretary of State,* 92 Mich 377, 383; 52 NW 469 (1892), quoting Cooley, *supra,* p 67, aff'd 146 US 1; 13 S Ct 3; 36 L Ed 869 (1892).]

its public universities. In 1837, the Legislature established the state's first public institution of higher learning, the University of Michigan, in Ann Arbor.[10] Upon its founding, the university was managed by the Legislature, and this arrangement was incorporated into the state's first constitution. Const 1835, art 10, § 5. Legislative regulation of the university was generally understood as disastrous, however, and a major focus of the Constitutional Convention of 1850 was the elimination of such supervision over the institution:

> Under the Constitution of 1835, the legislature had the entire control and management of the University and the University fund. They could appoint regents and professors, and establish departments. The University was not a success under this supervision by the legislature . . . . Such was the condition of affairs when [the Constitutional Convention of 1850] met. It is apparent to any reader of the debates in this convention in regard to the constitutional provision for the University that they had in mind the idea of permanency of location, to place it beyond mere political influence, and to intrust it to those who should be directly responsible and amenable to the people. [*Sterling v Univ of Michigan Regents,* 110 Mich 369, 374; 68 NW 253 (1896).][11]

[10] The University of Michigan was founded under an act of Congress making an appropriation of lands for the support of a university in this State, approved May 20, 1826. [*Sterling v Univ of Michigan Regents,* 110 Mich 369, 373; 68 NW 253 (1896).]

[11] A select committee was appointed by the legislature in 1840 to inquire into the condition of the University. . . . [This] report[ ] and discussion[ ] undoubtedly [was] known to the members of the convention, and their action should be construed in the light of such knowledge. [*Id.* at 375-377.]

The committee reported the dismal failure of the state-run public universities and the advantages of autonomous boards of education:

Thus, the Constitutional Convention of 1850 divested the Legislature of its picayune and unsuccessful regulation of education, and placed control of public universities in an independent body of government directly responsible to the people:

> The public men of those times were greatly interested in the University. . . . The general consensus of opinion was that it should be under the control and management of a permanent board, who should be responsible for its management.
>
> *       *       *
>
> Obviously, it was not the intention of the framers of the Constitution to take away from the people the government of this institution. On the

---

"No State institution in America has prospered as well as independent colleges with equal, and often with less, means. Why they have not may be ascribed, in part, to the following causes: They have not been guided by that oneness of purpose and singleness of aim (essential to their prosperity) that others have whose trustees are a permanent body,—men chosen for their supposed fitness for that very office, and who, having become acquainted with their duties, can and are disposed to pursue a steady course, which inspires confidence and insures success . . . . State institutions, on the contrary, have fallen into the hands of the several legislatures, fluctuating bodies of men, chosen with reference to their supposed qualifications for other duties than cherishing literary institutions. When legislatures have legislated directly for colleges, their measures have been as fluctuating as the changing materials of which the legislatures were composed.

*       *       *

"The argument by which legislatures have hitherto convinced themselves that it was their duty to legislate universities to death is this: 'It is a State institution, and we are the direct representatives of the people, and therefore it is expected of us; it is our right. The people have an interest in this thing, and we must attend to it.' As if, because a university belongs to the people, that were reason why it should be dosed to death for fear it would be sick, if left to be nursed, like other institutions, by its immediate guardians. Thus has State after State, in this American Union, endowed universities, and then, by repeated contradictory and over legislation, torn them to pieces with the same facility as they do the statute book, and for the same reason, because they have the right." [*Sterling, supra* at 375-377, quoting 2 House Documents 1840, p 470.]

contrary, they designed to, and did, provide for its
management and control by a body of eight men
elected . . . for long terms, and whose sole official
duty it should be to look after its interests, and
who should have the opportunity to investigate its
needs, and carefully deliberate and determine
what things would best promote its usefulness for
the benefit of the people. [*Id.* at 375-379.][12]

Hence, the Constitution of 1850 and its progeny[13]
specifically granted the board of regents of the
University of Michigan independent constitutional
status. This Court, therefore, has long recognized
that the Legislature and boards of education are
distinct and coequal governmental bodies vested
with separate powers:

> The board of regents and the legislature derive
> their power from the same supreme authority,
> namely, the Constitution. In so far as the powers
> of each are defined by that instrument, limitations
> are imposed, and a direct power conferred upon
> one necessarily excludes its existence in the other,
> in the absence of language showing the contrary
> intent. . . . They are separate and distinct consti-
> tutional bodies, with the powers of the regents
> defined. By no rule of construction can it be held
> that either can encroach upon or exercise the
> powers conferred upon the other. [*Id.* at 382.]

In other words, "the board of regents is made

---

12 So clear was the convention's intent, this Court has confidently
reported that there was not "a single utterance by any member of
that convention from which it could be inferred that the members
believed or supposed that they were leaving the control of that
institution to the legislature." *Sterling, supra* at 377. As one conven-
tioneer stated, " 'the convention will observe that the concerns of this
University are to be placed in the hands of the regents.' " Delegate
Whipple, quoted *id.* at 375.

13 Const 1850, art 13, reads in essence the same as the 1908
provision and subsequently the 1963 provision. [395 Mich 64,
n 8 *supra.*]

the highest form of juristic person known to the law, a constitutional corporation of independent authority, which, within the scope of its functions, is co-ordinate with and equal to that of the legislature." *Bd of Regents of Univ of Michigan v Auditor General,* 167 Mich 444, 450; 132 NW 1037 (1911).[14]

Hence, "the Legislature may not interfere with the management and control of" universities, *Regents of Univ of Michigan v Michigan,* 395 Mich 52, 65; 235 NW2d 1 (1975), nor may it "control the action of the Regents." *Weinberg v Regents of Univ of Michigan,* 97 Mich 246, 254; 56 NW 605 (1893). Justice WILLIAMS distilled from our constitution and precedent that "[t]he Legislature cannot interfere in the management of the university. [Nor may it] prohibit [or] require the universities to take any particular action." 395 Mich 92. In fact, "[t]he powers and prerogatives of Michigan universities have been jealously guarded not only by the boards of those universities but by this Court in a series of opinions running as far back as 1856." *Eastern Michigan Univ Bd of Control v Labor Mediation Bd,* 384 Mich 561, 565; 184 NW2d 921 (1971).[15]

[14] See also *People ex rel Drake v Regents of Univ of Michigan,* 4 Mich 98, 104 (1856); *Weinberg v Regents of Univ of Michigan,* 97 Mich 246, 254-255; 56 NW 605 (1893); *Bd of Agriculture v Auditor General,* 226 Mich 417, 423; 197 NW 160 (1924).

[15] See, e.g., *People ex rel Drake,* n 14 *supra; People v Regents of the Univ,* 18 Mich 469 (1869) (the Legislature may not mandate at least one professor of homeopathy in the department of education of defendant); *Weinberg, supra* at 254-255 (the public bonding statute does not apply to universities); *Sterling, supra* (the public act directing regents to establish a homeopathic medical college is unconstitutional); *Bauer v State Bd of Agriculture,* 164 Mich 415, 418-419; 129 NW 713 (1911) (universities possess exclusive control of appropriated funds, and may construct a building on college grounds to be leased as a post office); *Regents v Auditor General,* 167 Mich 450-451 (regents are not bound by the general accounting laws of the state unless they so consent); *Bd of Agriculture v Auditor General,* 180 Mich 349, 359; 147 NW 529 (1914) ("the legislature exceeded its

Nevertheless, this Court has noted that its historically strong protection of regental autonomy is not without exceptions. The Court has acknowledged that legislative regulation of the universities is not improper if legislation focuses upon the general welfare and does not interfere with the university's operations, finances, or mission:

"It is the opinion of this Court that the legislature can validly exercise its police power for the welfare of the people of this State, and a constitutional corporation such as the board of regents of the University of Michigan can lawfully be affected thereby. The University of Michigan is an independent branch of the government of the State of Michigan, but it is not an island. Within the confines of the operation and the allocation of funds of the University, it is supreme. Without these confines, however, there is no reason to allow the regents to use their independence to thwart the clearly established public policy of the people of Michigan." [*Univ of Michigan Regents v Employment Relations Comm,* 389 Mich 96, 108; 204 NW2d 218 (1973), quoting *Branum v Bd of Regents of Univ of Michigan,* 5 Mich App 134, 138-139; 145 NW2d 860 (1966).][16]

powers in attempting to deprive the relator of its constitutional control of agricultural college funds derived from the Federal government"); *Bd of Agriculture,* n 14 *supra,* 226 Mich 426-427 (conditions attached to appropriations were an unconstitutional infringement of regental autonomy); *Bd of Regents of Univ of Michigan v Michigan,* 166 Mich App 314; 419 NW2d 773 (1988) (the statute mandating divestment from corporations operating in South Africa by public educational institutions unconstitutionally infringed upon the defendant's grant of exclusive control and direction of expenditures to the university); *Michigan United Conservation Clubs v Bd of Trustees of Michigan State Univ,* 172 Mich App 189; 431 NW2d 217 (1988) (a university ordinance designating all lands and water under its control as a wildlife, fish, and bird sanctuary was within the constitutional and statutory authority of the board of trustees to control and manage university property); *Dynamic Heating & Pumping Co v Ins Co of North America,* 912 F2d 123 (CA 6, 1990) (the defendant was exempt from the Bonding Act requirements as a constitutionally created entity).

16 Plaintiffs suggest that because the FOIA states that "[i]t is the

This reading of the constitution is in accord with its language as well as the original intentions of the ratifiers and framers of the constitution when granting autonomous regental power. The thrust of the adoption of the constitutional provisions was to ensure university autonomy with regard to management and supervision of the educational process and related matters, but not with the general welfare of the community. The provision, for instance, clearly was not intended to permit a board of regents to decriminalize drugs for recreational use or violate child labor laws, nor was it intended to permit the regents to refuse compliance with other general welfare laws unless they interfered with their constitutionally conferred duties.[17]

On the other hand, the constitution clearly prohibits infringement of constitutionally enumerated regental power by the Legislature. Hence, this Court has held that although defendant was subject to the public employees relations act,[18] such regulation could not extend into the regents' constitutionally granted powers:

> Because of the unique nature of the University of Michigan . . . the scope of bargaining by [an

public policy of this state that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and public employees," MCL 15.231(2); MSA 4.1801(1)(2), the FOIA may apply in the instant case. However, the Legislature may not violate the constitution in pursuit of its own designated "public policy."

[17] *Glass v Dudley Paper Co,* 365 Mich 227; 112 NW2d 489 (1961) (holding that the specific constitutional authority of the Legislature to create courts and define their jurisdiction was sufficient to fix the jurisdiction of the Court of Claims and include Michigan State University within its exclusive jurisdiction); *Peters v Michigan State College,* 320 Mich 243; 30 NW2d 854 (1948) (upholding, by an equally divided vote, the Court of Appeals ruling that the Michigan State College was not exempt from the workers' compensation act).

[18] MCL 423.201 *et seq.;* MSA 17.455(1) *et seq.*

association of medical interns, residents, and post-doctoral fellows] may be limited if the subject matter falls clearly within the educational sphere. Some conditions of employment may not be subject to collective bargaining because those particular facets of employment would interfere with the autonomy of the Regents. [389 Mich 109.]

Similarly, in *Bd of Agriculture v Auditor General,* 226 Mich 417, 425; 197 NW 160 (1924), the Court ruled that although the Legislature may attach conditions to funding, not only may the regents reject such appropriations, but those conditions that infringed upon the regents' management and control of the institution were unconstitutional:

Clearly, in saying that the legislature can attach to an appropriation any condition which it may deem expedient and wise, the court had in mind only such a condition as the legislature had power to make. It did not mean that a condition could be imposed that would be an invasion of the constitutional rights and powers of the governing board of the college. It did not mean to say that, in order to avail itself of the money appropriated, the State board of agriculture must turn over to the legislature management and control of the college, or of any of its activities.[19]

Moreover, those cases permitting legislative interference with the regental power pitted one constitutional provision against another, and resolved the disputes by holding that the more specific power granted to the other branches of gov-

---

[19] Hence, the Legislature may not invade a university's management and control over its property, *Weinberg, supra* at 254-255; *Dynamic Heating & Pumping Co,* n 15 *supra,* or curriculum. *Sterling, supra* at 375, or finances. 226 Mich 426-427.

ernment overrode the general power of university autonomy.[20]

The Legislature, therefore, may not impose conditions on a board of regents that interfere with the supervision, management, or control of a university or that are related to its finances, property, or educational mission, and may only regulate university-related activities that have bearing on the general welfare and that arise from a constitutionally granted power.

IV

In the instant case, the plain meaning of the constitution, combined with the historical circumstances surrounding its adoption, reveal that the intentions of its ratifiers and framers were to grant autonomous regental power over the selection of the university president. The constitution endows the regents with the exclusive power to "elect a president of the institution under its supervision,"[21] and confers upon the regents "general supervision of its institution and the control and direction of all expenditures . . . ." Const 1963, art 8, § 5. That the ratifiers and framers of the constitution intended to prohibit legislative intervention in the fundamental operations of public universities may not be doubted. The historical circumstances that bore the constitutional provi-

[20] In *Univ of Michigan Regents v Employment Relations Comm,* *supra,* the Court noted that the resolution of public employee disputes was a matter of public policy as provided in art 4, § 48. In *Glass,* n 17 *supra,* the general autonomy of the university was pitted against the other branches' constitutional powers to establish and operate courts as conferred by art 7, § 1. Similarly, in *Peters,* n 17 *supra,* the dispute involved the provision of Const 1908, art 5, § 29, permitting the Legislature to create laws relating to employment versus the college's general constitutional autonomy.

[21] Regents may not delegate this power. See *Sittler v Bd of Control,* 333 Mich 681, 686; 53 NW2d 681 (1952).

sion evidence that regental autonomy in core educational functions, such as selecting a president, was the paramount concern of the ratifiers and framers of the section. Indeed, acknowledging that the selection of the president of a university is perhaps the most important function of the board of regents, the constitution explicitly granted the power to the regents,[22] who historically were unencumbered in their presidential selection process by the Legislature.[23] In short, legislative oversight of the presidential selection process strikes at the core of regental autonomy.

This is so because the procedures followed by defendant to select a president are a vital aspect of the "management and control of" the university. 395 Mich 65. As this Court is well aware, procedure often determines result. The OMA and the FOIA certainly attempt to "control the action of the Regents" by dramatically altering the method by which the board must fulfill its constitutionally vested duty. *Weinberg, supra* at 254.[24] Indeed, our well-established precedent manifests that most legislative efforts to control the university unconstitutionally have occurred when the "legislature attempted to impose its will upon the internal operations of a university." 384 Mich 565. The acts at issue are such attempts.

---

[22] Indeed, the Address to the People unambiguously declared that "[e]ach of the boards is permitted to choose the president of its university as presently provided." 2 Official Record, Constitutional Convention 1961, p 3396.

[23] Nearly all regental meetings were closed to the public except at the leisure of the board. See, e.g., Delegate White, 1 Official Record, Constitutional Convention 1961, p 1187.

[24] Moreover, defendant credibly maintains that it perceives that presidential searches would be hampered by compliance with the OMA. Whether this assertion is true is irrelevant, because defendant's determination in this policymaking arena may not be questioned by this Court. At issue is the clash between two lawmakers; I only resolve that defendant is entitled to autonomy in this area. See also n 28.

In *In re 1976 PA 267,* 400 Mich 660, 663; 255
NW2d 635 (1977), the Court recognized that the
separation of powers doctrine prohibits the appli-
cation of the OMA to the internal operations of the
judiciary:

> The judicial powers derived from the
> Constitution . . . have been exclusively entrusted
> to the judiciary by the Constitution and may not
> be diminished, exercised by, nor interfered with by
> the other branches of government without consti-
> tutional authorization. . . . 1976 PA 267 is an
> impermissible intrusion into the most basic day-to-
> day exercise of the constitutionally derived judicial
> powers.[25]

Similarly, the OMA and the FOIA strongly infringe
upon the internal workings of a university by
demanding the regents entirely rework their presi-
dential selection procedures to meet their require-
ments. The regents vigorously argue that an open
selection process will reduce both the quantity and
the quality of available candidates. The record
reveals that other regents from major Michigan
universities concur. Not unlike this Court, the
application of the OMA and the FOIA to the regents
is simply beyond the realm of legislative authority.

Moreover, the constitution rejects legislative at-
tempts to open the presidential selection process
because it fails to include the informal presidential
search process in its mandatory disclosure provi-
sion. Const 1963, art 8, § 4. Ratified concurrently
with art 8, § 5, art 8, § 4 mandates limited public
oversight over the universities: "Formal sessions of
governing boards of such institutions shall be open
to the public."

---

[25] So clear was the unconstitutionality of the application of the OMA
to the judiciary, that this Court was compelled to issue an extremely
rare advisory opinion informing the Legislature of the unconstitution-
ality of proposed OMA provisions.

At the Constitutional Convention, the author of
the provision explained its history and purpose:

> Meetings of governing boards of the 3 major
> universities have been open to the public and news
> media for the past ½ dozen years and that has
> been accomplished only after a long period of
> negotiations. As it stands, the public and news
> media are present only as a matter of sufferance.
> They are invited guests of the governing board, an
> invitation which could be, conceivably, withdrawn
> at any time. . . . [N]ow that we are creating by
> constitutional enactment 7 more such governing
> boards, it would be appropriate that their formal
> meetings should be conducted in public sessions.
> [Delegate White, 1 Official Record, Constitutional
> Convention 1961, p 1187.]

Similarly, the Address to the People stated that
this provision was enacted to "insure[ ] that formal
sessions of the governing boards of such institu-
tions will be open to the public." 2 Official Record,
Constitutional Convention 1961, p 3396.

Unmistakenly, the purpose of the provision was
to bring within the constitution the then-recent
practice of permitting public access to formal
meetings. No evidence, however, suggests that the
provision was intended or understood to mandate
the exposure of the entire presidential selection
process to public view, or to empower the Legisla-
ture to do so.[26] Indeed, the exclusionary language
of "formal" reveals the decision whether informal
meetings shall be held publicly is vested in the
regents. As noted at the Constitutional Convention
of 1961, before the adoption of art 8, § 4, regental
power permitted the exclusion of the public from

[26] Plaintiffs do not suggest that the then-existing practice was to
allow the press to accompany regents on interviews for possible
presidential candidates, nor do they suggest that such practice was
even considered at the adoption of the constitution.

all of its meetings; after the ratification of that provision, the same power rested with the regents except with relation to formal meetings. Indeed, that the convention considered a constitutional amendment necessary to ensure that the recent practice of open formal meetings continued strongly suggests that the framers understood that the regents possessed plenary power with regard to the issue. The presidential selection process, therefore, need not be disclosed except when conducted in a formal meeting, such as the election of the officer.[27]

---

[27] Unlike other provisions of the constitution, "formal sessions" are undefined and are not delegated to the Legislature to define. Hence, the constitution may leave the definition, if not patently unreasonable, to the boards. Cf. *Bd of Regents of Univ of Michigan v Auditor General, supra* at 449 (holding that regents could determine if their expenditures were "for lawful purposes").

In any event, the plain meaning of the constitutional provision prohibits the application of the OMA and the FOIA in the instant case. Unlike the OMA, the constitution only mandates that "[f]ormal sessions" be open to the public. Sources contemporary with the adoption of the amendment reveal that "formal" is defined as "belonging to or being the essential constitution or structure . . . following or according with established form, custom, or rule . . . based on conventional forms and rules," while "session" is defined as "a meeting or series of meetings of a body (as a court or legislature) for the transaction of business . . . ." *Webster's Seventh New Collegiate Dictionary* (1969), p 328; *id.* at 793. See also 37 CJS, formal, p 115 ("[o]f or pertaining to form, characterized by due form or order").

This definition comports with one drafted by the Attorney General:

"[F]ormal sessions" [is defined] as meetings or sittings of the respective governing bodies held in accordance with established rules of such bodies for the transaction of business. . . .

[W]henever the governing board of an educational institution of higher learning is convened in accordance with established rules of such body for the transaction of business, it must convene in public session . . . . [OAG, 1969-1970, No 4676, pp 73, 75 (August 13, 1969).]

Cf. *Severson v Sueppel,* 260 Iowa 1169, 1173-1174; 152 NW2d 281 (1967).

Meetings at which the regents follow established rules in order to formally transact business, therefore, must be open to the public. OAG, No 4676, *supra.* On the other hand, informal meetings need not

The plain understanding of the constitution, enlightened by the circumstances from which it arose, protects regental power from the Legislature's oversight in the instant case. The Legislature, therefore, possesses no power to force defendant to comply with the OMA and the FOIA[28] during the presidential selection process.[29]

be. The meetings at issue, therefore, were informal and need not have been open to the public.

[28] The Michigan Constitution also mandates that the financial records of public entities be open to public scrutiny:

> All financial records, accountings, audit reports and other reports of public moneys shall be public records and open to inspection. [Const 1963, art 9, § 23.]

"The manifest purpose of article 9, § 23 is to allow the public to keep their finger on the pulse of government spending." *Grayson v Bd of Accountancy,* 27 Mich App 26, 34; 183 NW2d 424 (1970). In the instant case, there is no doubt that the records of the expenditures by defendant must be open to public scrutiny in some manner. Hence, defendant must disclose that it purchased airline tickets, the price of the tickets, and other pertinent financial information. Defendant must release at least "summaries, balance sheets, and other such compilations which map out and correlate a myriad of financial transactions into a meaningful account." *Id.* On the other hand, whether a constitutional mandate exists which compels defendant to disclose the location of its travels is open to question. Cf. *id.* at 34-35 ("[i]t strains one's credulity to think that the framers of the Constitution meant to allow the public to inspect every receipt . . . and every writing evidencing a receipt or expenditure").

In any event, where the board, while exercising its exclusive authority to select a president, reasonably determines that such disclosure significantly hinders its ability to fulfill its constitutional duty, then the longstanding constitutional protection of regental autonomy should outweigh the minimal interest of financial record disclosure of the destination of such trips. Hence, in the conflict between these two constitutional provisions regental autonomy triumphs.

[29] Both sides vigorously contest the efficacy of a closed versus an open presidential selection process. These arguments, however, are irrelevant to the resolution of the instant case because the constitution has settled the issue:

> [T]he Court is not called upon to give its opinion as to whether the legislation in question is good public policy and the best part of wisdom for the Legislature and the universities to follow. We are asked only whether the legislative conditions

GRIFFIN, J., concurred with RILEY, J.

invade the constitutional jurisdiction of the universities. Therefore, our conclusions based on the Constitution and the foregoing precedents and our analysis of the lessons they teach can be seen only in that perspective. [395 Mich 76.]