*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HEART OF THE LAKES COMMUNITY, INC.,
AMIR DAIZA, A. BRADFORD BABBITT, DAVID
EMERLING, and CHRISTIAN SONNEVILLE,

        Plaintiffs-Appellants,

v

WEST BLOOMFIELD SCHOOL DISTRICT,
STACY BRICKMAN, and NELSON HERSH,

        Defendants-Appellees.

UNPUBLISHED
August 07, 2025
12:54 PM

No. 370569
Oakland Circuit Court
LC No. 2024-206217-CZ

Before: YOUNG, P.J., and GARRETT and WALLACE, JJ.

PER CURIAM.

This case concerns the Roosevelt School building (Roosevelt) in Keego Harbor, designed by famed architect Robert O. Derrick. Roosevelt opened in 1920 and, according to plaintiffs, it was the oldest continually operating school in Oakland County until its closure in 2022.[1] Defendant West Bloomfield School District (the School District) owns Roosevelt and intends to demolish the building. Plaintiffs oppose the demolition of the building and filed this action alleging several claims, including violation of the Open Meetings Act (OMA), MCL 15.261 *et seq.*, the Freedom of Information Act (FOIA), MCL 15.231 *et seq.*, and the Michigan Environmental Protection Act (MEPA), MCL 324.1701 *et seq.* Plaintiffs appeal by leave granted[2] the trial court's order denying their motion for a preliminary injunction and dissolving the temporary restraining order (TRO) that the court previously entered. Because the trial court lacked jurisdiction to invalidate the decision to demolish Roosevelt, and the court did not otherwise abuse its discretion by dissolving the TRO and denying the preliminary injunction, we affirm.

---

[1] Roosevelt has not been designated a historic landmark.

[2] *Heart of the Lakes Community, Inc v West Bloomfield Sch Dist*, unpublished order of the Court of Appeals, entered July 2, 2024 (Docket No. 370569).

# I. FACTUAL BACKGROUND

This appeal primarily involves plaintiffs' claims under the OMA and meetings related to the planned demolition of Roosevelt. Plaintiff Heart of the Lakes Community, Inc. is a nonprofit corporation based in Oakland County, and the individual plaintiffs live, work, and operate businesses in Oakland County. Plaintiffs vehemently oppose the demolition of Roosevelt. The School District closed Roosevelt in early June 2022 after a ceiling partially collapsed in an empty classroom. Later testing of the building revealed the presence of asbestos-containing materials.

In 2023, the School District formed a 12-member Strategic Visioning Committee (SVC) to address the ongoing needs of the District. The SVC included three members of the West Bloomfield School District Board of Education (the Board). The Board's President, defendant Stacy Brickman, was on the SVC, but the Board's Vice President, defendant Nelson Hersh, was not. During a July 17, 2023 Board meeting, the SVC made several recommendations. In relevant part, the SVC recommended (1) blending the students from Roosevelt with the students from two other elementary schools, (2) closing Roosevelt, (3) demolishing Roosevelt, and (4) converting the land into multiuse fields. The Board held several stakeholder informational and feedback sessions on the SVC's proposals in August and September 2023. The Board also conducted a September 11, 2023 Study Session, where it heard public comments.

During a September 18, 2023 Board meeting, at the recommendation of the SVC, the Board voted, five members to two members, to demolish Roosevelt. The meeting was open to the public, and the Board heard comments from the public. A motion to delay the decision failed by a 4-3 vote, and a motion to delay demolition activities failed by 5-2 vote. Plaintiffs maintain that, since the Board voted to demolish Roosevelt, developers and organizations have submitted proposals to purchase and use the building instead of demolishing it. They assert that the School District secreted and turned down those offers because of fear that a developer would use the property as a competing charter school.

In January 2024, plaintiff Christian Sonneville submitted a FOIA request to the School District. He later amended his request. The School District estimated the cost to produce copies of the requested documents at $7,782.24. The School District also required a 50% deposit. Instead of copying the documents, the School District allowed Sonneville to view the documents in person, but he believed some documents were missing.

During a February 15, 2024 public meeting, the School District announced the bids for the demolition of Roosevelt. The following day, it announced the three bids submitted for the asbestos abatement. On March 4, 2024, the Board held a study session to review the bids submitted. At the session, the Board's construction manager, AUCH, presented information and made a recommendation. The School District's Assistant Superintendent for Facilities and Operations, Jamie Stottlemyer, presented information regarding the costs associated with the demolition and asbestos abatement. The Board also heard comments from the public.

At the study session, the Board discussed the bids and the financial consequences of demolition, but did not make any decisions on the matter. One Board member asserted that the low bidder for the asbestos abatement had three or four safety violations through the Michigan Occupational Safety and Health Administration (MIOSHA). Before the Board voted to select the

contractors, plaintiffs filed this action against defendants. The Board then met at a March 18, 2024 Board meeting. There was a large public attendance at the meeting, and the Board heard public comments from individuals who again asked the Board to preserve Roosevelt and reconsider its demolition decision. Some debate occurred regarding whether the Board should revisit the issue of demolition. During the meeting, the Board voted to select the lowest bidders as the demolition and asbestos-abatement contractors.

The next day, plaintiffs amended their complaint to add allegations related to the March 18, 2024 Board meeting. Plaintiffs' claims included:

- Count I: A claim for injunctive relief for a violation § 10 of the OMA, MCL 15.270, against the School District in relation to the March 18, 2024 Board meeting;

- Count II: A claim for damages for a violation of § 13 of the OMA, MCL 15.273, against Brickman and Hersh in relation to the March 18, 2024 Board meeting;

- Count III: A claim for prospective injunctive relief under § 11 of the OMA, MCL 15.271, against the School District to enjoin further noncompliance with the Act;

- Count IV: A claim for damages for violation of the OMA, MCL 15.273, against Brickman and Hersh in relation to the September 18, 2023 meeting;

- Count V: A claim for damages and injunctive relief for a violation of §§ 4 and 10a of the FOIA, MCL 15.234 and MCL 15.240a, against the School District;

- Count VI: A claim seeking a declaratory judgment and injunctive relief under the MEPA against the School District; and

- Count VII: A claim alleging a negligent nuisance and seeking a declaratory judgment against the School District.

On the same day, plaintiffs filed an emergency motion for an ex parte TRO to prevent demolition and asbestos abatement. Two days later, plaintiffs amended their motion, asserting that defendants had already begun demolishing Roosevelt.

The trial court granted plaintiffs' motion for an ex parte TRO based on plaintiffs' representations and ordered defendants to appear and show cause why a preliminary injunction should not issue. Before the show-cause hearing, defendants responded to plaintiffs' motion, denying that demolition had begun and that they violated the OMA or any other laws.

After the show-cause hearing, the trial court issued a written opinion and order. The court addressed the four factors courts must consider when deciding whether to grant a preliminary injunction—the likelihood of prevailing on the merits, the danger of irreparable harm if the injunction is not issued, the comparative risks to the parties, and the harm to the public interest if the injunction is issued. First, the court concluded that plaintiffs were unlikely to prevail on the merits of their claims. Although plaintiffs' amended motion for an ex parte TRO sought injunctive relief based only on Counts I and II, the trial court addressed all of plaintiffs' claims. Regarding

the claims pertaining to the September 18, 2023 Board meeting at which the Board voted to demolish Roosevelt, the court explained that plaintiffs failed to file their action within 60 days after the minutes of that meeting were made available to the public. Therefore, the court determined that it lacked jurisdiction to invalidate the demolition decision under MCL 15.270 of the OMA.

Regarding the Board's March 18, 2024 selection of contractors, the court determined that the Board held an open study session on the issue whether to approve the bids. The court reviewed the School District's website and found that the bids were posted on the website for public review before that meeting. The court also concluded that the Board was able to delegate certain competitive-bidding functions to a construction manager, like AUCH, as long as it retained its statutory authority to set bid specifications, advertise for bids, and accept or reject bids.

With respect to plaintiffs' FOIA claim, the court ruled that the FOIA allowed the public body to charge a fee for copying public records and to require a deposit equal to 50% of the estimated fee. Further, the court ruled that the MEPA claim was speculative in nature, and the negligent-nuisance claim was not ripe because demolition had not started. Therefore, the court found that plaintiffs were unlikely to prevail on the merits.

Regarding the second factor—the danger that plaintiffs would suffer irreparable harm if the injunction was not issued—the court determined that factor weighed in plaintiffs' favor because Roosevelt was "unique and irreplaceable." The court determined that the third factor— the comparable risks of harm—weighed against an injunction because the School District had no obligation to sell the property, and an injunction would simply delay demolition because plaintiffs could not invalidate the Board's vote to demolish Roosevelt. Finally, regarding the fourth factor— the harm to the public interest—the court ruled that the public interest weighed against an injunction because the public has an interest in maintaining an independent education system, and the School District has the right to manage its property. Because three of the four factors weighed against an injunction, the court denied the preliminary injunction and dissolved the TRO. This appeal followed. This Court stayed the demolition of Roosevelt during the pendency of this appeal.[3]

## II. STANDARDS OF REVIEW

We review for an abuse of discretion the trial court's decision on a motion for injunctive relief. *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 8; 753 NW2d 595 (2008). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). We review for clear error the trial court's factual findings in determining whether to grant a preliminary injunction. *Slis v State*, 332 Mich App 312, 335; 956 NW2d 569 (2020). Clear error occurs when we are definitely and firmly convinced that the trial court made a mistake. *Hill v City of Warren*, 276 Mich App 299, 308; 740 NW2d 706 (2007).

---

[3] *Heart of the Lakes Community v West Bloomfield Sch Dist*, unpublished order of the Court of Appeals, entered April 30, 2024 (Docket No. 370569).

III. ANALYSIS

A preliminary injunction is designed to preserve the status quo pending a final hearing. *Hammel v Speaker of the House of Representatives*, 297 Mich App 641, 647; 825 NW2d 616 (2012). An injunction is an extraordinary remedy that should be issued only when justice requires, when the law provides no adequate remedy, and when a real and imminent danger of irreparable injury exists. *Pontiac Fire Fighters Union*, 482 Mich at 8. The moving party bears the burden of establishing that the following four elements favor issuing the preliminary injunction:

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued. [*Hammel*, 297 Mich App at 648 (citation omitted).]

Plaintiffs do not challenge the second element, which the trial court determined weighed in their favor. They instead focus on the other three elements. Before we address those elements, we clarify the scope of this appeal.

A. JURISDICTION

The trial court correctly determined it lacked jurisdiction to invalidate the Board's September 18, 2023 decision to demolish Roosevelt because plaintiffs failed to file their lawsuit within the 60-day limitations period.[4]

The OMA provides a three-tiered enforcement scheme under which private litigants may obtain relief under the Act. *Citizens for a Better Algonac Community Schs v Algonac Community Schs*, 317 Mich App 171, 179; 894 NW2d 645 (2016). First, MCL 15.270 provides, in relevant part, that a decision of a public body is presumed to have been adopted in compliance with the OMA, and that an individual may file a civil action challenging the validity of the public body's decision. MCL 15.270(1). The statute grants the trial court authority to invalidate the public body's decision if the public body fails to comply with certain provisions of MCL 15.263 of the OMA, and the court finds that noncompliance has impaired the rights of the public. MCL 15.270(2). However, the applicable provision contains a short limitations period:

> The circuit court shall not have jurisdiction to invalidate a decision of a public body for a violation of this act unless an action is commenced pursuant to this section within the following specified period of time:

---

[4] We decline to consider Exhibits 8 and 10 to plaintiffs' brief on appeal because those exhibits were not presented to the trial court. Consideration of the exhibits would constitute an improper expansion of the record on appeal. See *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002).

(a) Within 60 days after the approved minutes are made available to the public by the public body except as otherwise provided in subdivision (b). [MCL 15.270(3)(a).][5]

Second, MCL 15.271(1) authorizes the filing of a civil action to enjoin noncompliance with the OMA. The provision states, "If a public body is not complying with this act, the attorney general, prosecuting attorney of the county in which the public body serves, or a person may commence a civil action to compel compliance or to enjoin further noncompliance with this act." *Id*. MCL 15.271 does not have the same limitations period as MCL 15.270, but it does not authorize invalidation of the public body's decision.

Third, MCL 15.273 outlines the process for filing an OMA lawsuit against an individual public official and provides, in relevant part:

A public official who intentionally violates this act shall be personally liable in a civil action for actual and exemplary damages of not more than $500.00 total, plus court costs and actual attorney fees to a person or group of persons bringing the action. [MCL 15.273(1).]

An action under this section of the OMA must be filed within 180 days after the date of the violation. MCL 15.273(2).

The parties do not dispute that plaintiffs failed to file their lawsuit within 60 days after the approved minutes from the September 18, 2023 meeting were made available to the public, which occurred in October 2023. Therefore, the 60-day limitations period for plaintiffs to challenge the decision made at that meeting expired before plaintiffs sued defendants. See MCL 15.270(3)(a). Accordingly, the trial court lacked jurisdiction to invalidate the decision to demolish Roosevelt.

Plaintiffs argue that the trial court may nevertheless invalidate the Board's decision to demolish Roosevelt because the Board assured the public that its decision to demolish the building was an open issue until after the Board voted on the bids at the March 18, 2024 Board meeting. Plaintiffs rely on a video recording of the September 18, 2023 meeting in support of their argument, but that video was not presented to the trial court for review. Moreover, the Board did not vote again on the issue of demolition during the March 18, 2024 meeting, nor was the possibility of re-voting on the issue raised during the March 4, 2024 Study Session. While two Board members urged the Board during the March 18, 2024 meeting to reconsider demolition, their comments indicated that the Board's previous vote on the subject constituted its final decision on the matter. Therefore, because the approved minutes of the Board's September 18, 2023

---

[5] Additionally, the OMA provides the public body with an alternative course of action. MCL 15.270(5) provides, in relevant part:

In any case where an action has been initiated to invalidate a decision of a public body on the ground that it was not taken in conformity with the requirements of this act, the public body may, without being deemed to make any admission contrary to its interest, reenact the disputed decision in conformity with this act.

meeting were released to the public more than 60 days before plaintiffs filed their lawsuit, the trial court lacked jurisdiction to invalidate the Board's demolition decision. Bearing this conclusion in mind, we turn to the merits of plaintiffs' claims.

## B. COUNT I

### 1. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs argue the trial court erred by determining that they are unlikely to succeed on the merits of Count I of their amended complaint, alleging that, before the March 18, 2024 Board meeting, defendants improperly delegated the Board's decision-making authority to Stottlemyer and AUCH regarding the selection of demolition and asbestos-abatement contractors. Plaintiffs contend the trial court overlooked that AUCH and Stottlemyer deliberated on the bids during closed-door sessions. They also assert that the Board rubber-stamped AUCH and Stottlemyer's decisions in lieu of conducting its own deliberations. We disagree.

The OMA generally requires that a public body's decisions, deliberations, and meetings be open to the public. See MCL 15.263(1) to (3); *Pinebrook Warren, LLC v City of Warren*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket Nos. 164869, 164870, 164871, 164872, 164873, 164874, 164875, 164876, and 164877); slip op at 21. The first question in determining whether the OMA applies is whether the entity at issue is a public body; the second question is whether the entity engaged in deliberations or made decisions. The OMA defines the term "public body" as

> any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function; a lessee of such a body performing an essential public purpose and function pursuant to the lease agreement; or the board of a nonprofit corporation formed by a city under [MCL 117.4o]. [MCL 15.262(a).]

In addition, the OMA defines the term "decision" as "a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy." MCL 15.262(d).

A public body can either fall within the statutory definition or become a public body because another public body delegated its authority to the entity. *Pinebrook Warren*, ___ Mich at ___; slip op at 22. In this case, it is undisputed that AUCH and Stottlemyer were not public bodies as defined under the OMA. Rather, the issue is whether the Board delegated authority to them.

In *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 226; 507 NW2d 422 (1993), our Supreme Court addressed whether the University of Michigan Regents engaged in closed-session deliberations when selecting the next university president. The Board of Regents appointed itself as the presidential selection committee to select the new president after the current president announced his resignation. *Id*. at 215-216. The selection committee formed three advisory committees, none of which had a quorum of regents, and slowly narrowed down a list of candidates. *Id*. The selection committee appointed one regent, Regent Paul W. Brown, with sole

authority to make the first cut. *Id*. at 216. Brown made numerous phone calls and conducted meetings with the advisory committees and informal subquorum groups of regents behind closed doors. *Id.*

The second phase of cuts was conducted essentially the same as the first phase, with Brown performing much of the legwork. *Id*. at 217. During the fourth phase, groups of two, three, or four regents conducted private interviews with the candidates. *Id*. at 218. Once the list was narrowed to five candidates, the Board of Regents established a nominating committee, which met behind closed doors and decided to recommend one candidate. *Id*. at 219. The Board later reconvened at a public session and voted to elect that candidate as the university president, without deliberation. *Id*. The Court held that the various committees and subcommittees constituted public bodies under the OMA, *id*. at 226, and that the Board's actions in narrowing the list of candidates behind closed doors were closed-session deliberations and decisions in violation of the OMA, *id*. at 229-231.

In contrast, in *Herald Co v Bay City*, 463 Mich 111, 115-116; 614 NW2d 873 (2000), our Supreme Court concluded the Bay City Manager did not act as a public body under the OMA during the selection of a new fire chief. The city charter provided that the Bay City Commission must appoint the fire chief on the recommendation of the city manager. *Id*. at 115. The city manager formed a committee to assist him in making his recommendation. *Id*. All the committee's meetings and interviews leading up to the city manager's recommendation were conducted in private. *Id*. at 116. The city manager recommended a candidate to the City Commission, which deliberated and voted to approve the appointment at an open meeting. *Id*.

On appeal, our Supreme Court held that the City Commission did not delegate its authority to the city manager because he had independent authority outlined in the city charter. *Id*. at 132. Moreover, the Court reasoned, "the fact that the charter requires the City Commission to act only on the recommendation of the city manager in no way constitutes a delegation of the commission's right to make the final determination regarding whether a recommended individual should be appointed to the position . . . ." *Id*. The Court distinguished *Booth* on the basis that the Board of Regents in *Booth* was clearly a public body and had delegated its authority to avoid the requirements of the OMA. *Id*. at 134. See also *Davis v Detroit Fin Review Team*, 296 Mich App 568, 608-609; 821 NW2d 896 (2012) (holding that a Detroit financial-review team was not a public body because the financial-review team could only make recommendations and could not act on them).

Plaintiffs rely, in large part, on our Supreme Court's recent decision in *Pinebrook Warren*. In that case, our Supreme Court addressed whether a local marijuana-review committee was a public body subject to the OMA. *Pinebrook Warren*, ___ Mich at ___; slip op at 12. A local ordinance created and set forth the duties of the marijuana-review committee, which included reviewing applications and plans for marijuana dispensary licenses. *Id*. at ___; slip op at 14-15. The review committee included several members of the city council, but was also composed of other persons. *Id*. at ___; slip op at 15. The review committee met to discuss applications for licenses several times, but the meetings were not open to the public, and no minutes were taken. *Id*. at___; slip op at 16, 30-31. The city council then voted to adopt the review committee's recommendations, but did not "substantively discuss the merits of the applications." *Id*. at ___; slip op at 16-17.

The Court held that the review committee was subject to the OMA because the actual functions of the marijuana-review committee showed that it was a governing body empowered by ordinance to perform a governmental function. *Id.* at ___; slip op at 32. The Court explained that it had to look at not only the language of the governing ordinance or document, but also at how the public body and the entity in question actually operated. *Id.* at ___; slip op at 29. The Court concluded that the review committee was the de facto decision-maker on which individuals or entities would receive licenses. *Id.* at ___; slip op at 29-30. The Court explained, "If the second entity makes public policy decisions that would otherwise have had to have been made by the original public body according to the law, then the second entity is also a public body covered by the OMA." *Id.* at ___; slip op at 29. By scoring applications, the review committee performed a governmental function, and by effectively deciding who would receive a license, the committee became a governing body. *Id.* at ___; slip op at 29. In particular, the city council did not consider independently the merits of the applications and simply adopted the review committee's work, despite the fact that the relevant ordinance provided that the council's job was to rank the applicants. *Id.* at ___; slip op at 29-31. The Court distinguished *Herald Co* on the basis that the city council had both created the review committee and provided it with authority to act on behalf of the council. *Id.* at ___; slip op at 32-33.

More recently, in *Exclusive Capital Partners, LLC v Royal Oak*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket Nos. 366247 and 366257); slip op at 21, this Court addressed a situation in which a city commission delegated authority to a city manager, who acted as the de facto decision-maker in awarding marijuana retail licenses. In that case, the city commission granted the city manager authority to implement and administer the license-application process. *Id.* at ___; slip op at 23. However, in practice, the city manager decided which entities received licenses, with the help of a private workgroup. *Id.* at ___; slip op at 23. The city manager considered the 31 applications the city received, met with the workgroup behind closed doors, and ranked the applicants. *Id.* at ___; slip op at 23. The city commission adopted the city manager's recommendation "without apparent deliberation," and its meeting minutes reflected that it did not discuss the losing applicants. *Id.* at ___; slip op at 23. "Because the city manager made a de facto policy choice for the City Commission, the city manager met the definition of 'governing body,' and, thus, was subject to the OMA." *Id.* at ___; slip op at 23. Therefore, the decisions should have occurred in a public meeting. *Id.* at ___; slip op at 24. However, this Court clarified that the workgroup commissioned by the city manager was not a public body because no public body delegated authority to it, and it acted solely as an advisor to the city manager. *Id.* at ___; slip op at 23 n 8.

*Pinebrook Warren* and *Booth* are distinguishable from the instant case on their facts. In both cases, the entity or individual in question, behind closed doors, reduced the candidates to a single choice, which the public body at issue sanctioned without any deliberation. The same principle applied in *Exclusive Capital Partners*, where the city manager acted as the de facto decisionmaker. In those cases, the committee or individual in question did not act in a purely advisory role.

In the instant case, the Board followed the requirements of MCL 380.1267, a provision of the Revised School Code, when it publicly announced the bids for demolition and asbestos abatement in February 2024. See MCL 380.1267(6). Thereafter, the Board conducted a public meeting and a study session concerning the matter. A 1992 Attorney General opinion indicates

that a school district may employ a construction manager to contract with trade contractors for the construction of facilities when "the board retains and exercises its statutory authority to set bid specifications, advertise for bids, accept or reject any bids and require and receive the statutorily mandated security amount." OAG, 1991-1992, No. 6734 (October 12, 1992), available at <https://www.ag.state.mi.us/opinion/datafiles/1990s/op06734.htm> (accessed July 28, 2025).

The record does not indicate that the Board authorized Stottlemyer or AUCH to perform any of its functions by delegation. In fact, it is unclear from the record the precise functions that Stottlemyer and AUCH performed other than assisting the Board in understanding the bids. The Board retained the authority to accept or reject bids and exercised that authority during its March 18, 2024 meeting. Therefore, as in *Herald Co*, the Board did not delegate its authority for purposes of the OMA. Although Stottlemyer and AUCH may have assisted the Board in its decision-making functions, there is no indication that AUCH or Stottlemyer themselves performed those functions.

Additionally, unlike the public bodies in *Booth*, *Pinebrook Warren*, and *Exclusive Capital Partners*, the Board deliberated at meetings open to the public. The Board held a March 4, 2024 Study Session at which AUCH and Stottlemyer gave a slide presentation and answered questions of the Board. The Board heard public comment, including from plaintiffs Sonneville, Emerling, and Babbitt, and Board members discussed the bids among themselves. In addition, Board members voiced concern regarding the bids, including concern that the lowest-bidding asbestos abatement contractor had previous MIOSHA violations. The Board did not make any decisions at the Study Session.

During the March 18, 2024 meeting, which was heavily attended by members of the public, the Board heard additional public comment from numerous audience members. In addition, AUCH and Stottlemyer again gave a slide presentation and discussed the lowest bids received for demolition and asbestos abatement. Addressing the concern expressed at the March 4, 2024 Study Session regarding the lowest asbestos-abatement bid, Stottlemyer stated that asbestos abatement is a highly-regulated industry and that all of the asbestos abatement contractors that submitted bids had similar MIOSHA violations. Stottlemyer recommended that the Board approve the lowest demolition and asbestos-abatement bids. One Board member urged the Board to delay demolition and sell the building, and another member also voiced opposition to demolishing the building. Stottlemyer answered further questions from one Board member, following which the Board approved the lowest bids with a 4-2 vote. Therefore, the Board *did* deliberate on the bids and did not merely rubber-stamp AUCH's and Stottlemyer's recommendations. Although the Board did not discuss each of the bids individually at either meeting, the OMA does not require a specific level of deliberation. Plaintiffs cite no provision of the OMA, or other law, that required the Board to discuss each individual bid before voting.

Related to this issue, plaintiffs argue that the trial court clearly erred when it found that the Board posted the bids on the School District's website before the March 4, 2024 Study Session. Plaintiffs contend that the Board did not post the information on the website until after they filed this lawsuit. Plaintiffs do not explain the relevance of when the bids were posted on the website or how the alleged failure to post the bids before the March 4, 2024 Study Session amounts to an OMA violation, particularly when there is no dispute that the bids were announced publicly in February 2024. Moreover, the trial court did not focus on this factor in its determination. Therefore, even assuming the trial court committed a factual error by concluding that the Board

posted the bids on the website before the study session, that finding was not dispositive to the trial court's ruling.

Accordingly, the evidence does not show that defendants violated the OMA with respect to the demolition and asbestos-abatement bids. The Board did not delegate its functions to Stottlemyer or AUCH, it held a study session and a board meeting at which it heard comments from the public, and no evidence indicates that any deliberations or decisions were made behind closed doors. Therefore, the trial court properly concluded that plaintiffs were unlikely to prevail on the merits with respect to Count I.

## 2. THE BALANCE OF HARMS BETWEEN THE PARTIES

The trial court's determination that the balance of the harms weighed against a preliminary injunction was not clearly erroneous. The court recognized that the risk of harm to plaintiffs was the loss of a unique and historical building, but it also recognized that it lacked jurisdiction to invalidate the demolition decision. Therefore, the court properly determined that an injunction would impact only the bids for demolition and asbestos abatement and would merely delay demolition to the School District's detriment because it would incur costs and expenses to secure and maintain the building before demolition inevitably occurs.

Plaintiffs speculate that the School District's contracts with the winning bidders would protect the District from the financial consequences of an injunction. However, the contracts were not presented to the trial court for review and were not presented to this Court. Plaintiffs do not dispute that the District will need to secure and maintain Roosevelt throughout the duration of an injunction, which would financially harm the District. Moreover, plaintiffs overlook that the District has incurred costs to secure and maintain Roosevelt while this action is pending. For these reasons, the trial court did not clearly err by finding that the balance of harms favors defendants.

## 3. HARM TO THE PUBLIC INTEREST

Finally, the trial court did not clearly err by determining that the public interest would be harmed if a preliminary injunction was issued. The court properly recognized that it was not tasked with balancing the harms to the public interest, but rather, it was required to assess the harm to the public interest *if it issued the injunction*. The court reasoned that the public would be harmed if it issued an injunction because of the public interest in maintaining an independent education system, free from interference. The court reasoned that MCL 380.11a(3)(c) of the Revised School Code, MCL 380.1 *et seq.*, grants the School District the right to manage its property, including disposing of or demolishing its property. Accordingly, the District, through its Board, had the authority to decide what to do with the property, regardless of how unpopular the decision was within the community. Thus, the trial court did not clearly err by finding that this factor favored defendants. For the reasons discussed above, the trial court's decision denying plaintiffs' request for a preliminary injunction was not outside the range of reasonable and principled outcomes.

## C. COUNTS II THROUGH VII

Plaintiffs' amended motion for an ex parte TRO sought injunctive relief based only on Counts I and II. Notwithstanding the limited claims before the trial court, the court addressed the likelihood of plaintiffs' success on the merits with respect to all of their claims, regardless of

whether the relief available and sought was directly related to the preservation of Roosevelt. For the reasons discussed below, we conclude that a preliminary injunction was inappropriate regarding Counts II through VII regardless of the likelihood of the claims' success on the merits.

Counts II and IV of plaintiffs' amended complaint allege violations of MCL 15.273 of the OMA against defendants Brickman and Hersh. MCL 15.273(1) provides:

> A public official who intentionally violates this act shall be personally liable in a civil action for actual and exemplary damages of not more than $500.00 total, plus court costs and actual attorney fees to a person or group of persons bringing the action.

Thus, the relief obtainable for Counts II and IV is limited to monetary damages, a legal remedy. See *Madugula v Taub*, 496 Mich 685, 714; 853 NW2d 75 (2014) (recognizing that monetary damages "are generally a legal remedy.") "[A] a preliminary injunction should not issue where an adequate legal remedy is available." *Pontiac Fire Fighters Union*, 482 Mich at 9. Because the OMA limits the remedy for claims against public officials to monetary damages, which is the only relief plaintiffs seek in Counts II and IV, a preliminary injunction prohibiting the demolition of Roosevelt would have been inappropriate and unrelated to the relief sought.

Count III of plaintiffs' amended complaint seeks injunctive relief to compel the School District to comply with the OMA and enjoin any further noncompliance with the Act. MCL 15.271(1) provides, "If a public body is not complying with this act, the attorney general, prosecuting attorney of the county in which the public body serves, or a person may commence a civil action to compel compliance or to enjoin further noncompliance with this act." Factually, plaintiffs alleged in Count III that the School District failed to comply with the Act with respect to the September 18, 2023 Board Meeting. As previously recognized, the trial court lacked jurisdiction to overturn the demolition decision made at the September 18, 2023 Board Meeting. Moreover, injunctive relief compelling future compliance with the OMA is unrelated to preventing the demolition of Roosevelt, the purpose for which plaintiffs sought the preliminary injunction. Therefore, a preliminary injunction with respect to Count III would have been improper.

In Count V of their amended complaint, plaintiffs allege that the School District violated the FOIA by charging an unreasonable and excessive fee for records. Count V is unrelated to the Roosevelt building itself. Therefore, a preliminary injunction preserving the building during the pendency of plaintiffs' action was unnecessary with respect to plaintiffs' FOIA claim.

Finally, Count VI of plaintiffs' amended complaint seeks declaratory and injunctive relief under the MEPA. In Count VI, plaintiffs allege that the proposed demolition will, according to the School District's own experts, pollute the air and cause asbestos exposure above normal levels. Similarly, Count VII of plaintiffs' amended complaint seeks a declaratory judgment that the planned demolition without proper asbestos abatement constitutes a negligent nuisance. As the trial court recognized, MCL 324.1703(1) required plaintiffs to make a prima facie showing that defendants' conduct "has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources." Plaintiffs have made no such showing, and their claim that demolition in accordance with the current plan will

result in asbestos pollution is purely speculative. "The mere apprehension of future injury or damage cannot be the basis for injunctive relief." *Pontiac Fire Fighters Union*, 482 Mich at 9.

Affirmed.

/s/ Adrienne N. Young
/s/ Kristina Robinson Garrett
/s/ Randy J. Wallace